582 So.2d 487 (1991)
GEORGIA CASUALTY AND SURETY COMPANY
v.
Mary Elizabeth WHITE, as executrix of the Estate of Johnny C. White, deceased.
89-88.
Supreme Court of Alabama.
May 31, 1991.
*489 Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, Montgomery, for appellant.
Jere L. Beasley and Frank M. Wilson of Beasley, Wilson, Allen, Mendelsohn & Jemison, Montgomery, and Boyd Whigham, Clayton, for appellee.
INGRAM, Justice.
This appeal is from a judgment based on a verdict for $2,000,000 against Georgia Casualty and Surety Company on a "bad faith" claim. The parties have been before this court three times previous to this appeal. See White v. Georgia Casualty & Surety Insurance Co., 520 So.2d 140 (Ala. 1987); Ex parte Georgia Casualty & Surety Co., 531 So.2d 838 (Ala.1988); and Ex parte Georgia Casualty & Surety Co., 562 So.2d 314 (Ala.1989).
This action arose from a motor vehicle collision in which Johnny C. White and his wife, Mary Elizabeth White, were injured. On November 4, 1983, Mr. White was driving a gas delivery truck, within the scope of his employment, when his truck was hit by an automobile being driven by an uninsured driver; Mrs. White was a passenger in the truck. The record shows that the uninsured motorist was at fault and that Mr. White was not contributorily negligent.
Mr. White's employer had insurance with Georgia Casualty on 12 trucks, and the uninsured motorist coverage limit on each truck was $10,000 per person. After an investigation, Georgia Casualty determined that the settlement value of the claim was at the limit of $10,000; nevertheless, on or about June 22, 1984, according to the record, Georgia Casualty authorized its agent to settle at or below $7,500. The Whites refused the offer to settle for $7,500, but on September 12, 1984, Mr. and Mrs. White each accepted payment of $10,000.
On October 24, 1984, the Whites filed a complaint alleging multiple claims against multiple defendants. The complaint contained a claim against Georgia Casualty for the amount available to Mr. and Mrs. White under the insurance policies on the 12 trucks ($120,000 each) less the amount paid to each on September 12, 1984 ($10,000 each), for a total of $110,000 each.
The Whites filed amendments to their complaint on March 28, 1985, and on May 2, 1985, adding claims of fraudulent misrepresentation. The first amended complaint, filed on March 28, 1985, alleged that Georgia Casualty had fraudulently misrepresented that the maximum amount that could be paid to each of the Whites for uninsured motorist benefits was $10,000, the limit per person on the policy covering the truck Mr. White was driving at the time of the accident, *490 instead of $120,000, the total available per person if the policies, covering all 12 trucks in Mr. White's employer's fleet, were "stacked" (12 × $10,000). In the second amended complaint, filed on May 2, 1985, the Whites averred that agents and employees of Georgia Casualty had conspired to deny workmen's compensation coverage to Mr. White in order to defraud him of money due under the workmen's compensation policy as well as to prevent Mr. White from obtaining the benefits of stacking. Georgia Casualty filed answers denying these allegations.
On April 30, 1985, Georgia Casualty filed a motion for summary judgment as to all claims. On December 19, 1985, the trial court entered a summary judgment for Georgia Casualty, holding that the Whites were "insureds of the second class" and, therefore, were not entitled to stack the uninsured motorist coverage. The trial court further held that because the Whites had been paid $10,000 each, Georgia Casualty was not further liable. The Whites appealed that summary judgment.
On July 2, 1987, in White v. Georgia Casualty & Surety Co., 520 So.2d 140 (Ala. 1988) (hereinafter White I), this Court held that Mr. White was an insured of the first class and, therefore, was entitled to stack the coverage on the other vehicles insured by Georgia Casualty under the fleet policy owned by Mr. White's employer. However, this Court held that Mrs. White was an insured of the second class and was not entitled to stack coverage. Her recovery was limited to the $10,000 limit of primary coverage as stated in the policy. The Whites' application for rehearing was denied on February 12, 1988, and the certificate of judgment was issued on March 1, 1988.
Mr. White died in October 1987, during the pendency of the application for rehearing in White I. On February 3, 1988, Mrs. White filed a motion to substitute herself as the personal representative of the estate of Mr. White.
The opinion in White I addressed only the "entitlement to stack" issue, leaving uncertainty as to any appellate disposition of the two fraud claims that had been alleged in the first and second amended complaints. One claim alleged a fraudulent misrepresentation of the amount recoverable under the uninsured motorist policy, i.e., a representation that Mr. White was not entitled to stack the policies. The other claim alleged fraud in conspiring to deny workmen's compensation benefits. Georgia Casualty petitioned this Court for a writ of mandamus, contending that neither of the two fraud claims survived this Court's July 1987 decision in White I. On August 26, 1988, in Ex parte Georgia Casualty & Surety Co., 531 So.2d 838 (Ala. 1988) (White II), this Court denied the petition and ruled that the first fraud claim, alleging misrepresentations concerning entitlement to stack coverage, was not barred by the decision in White I and could be maintained. However, the Court went on to hold that the Whites' failure to argue the second fraud claim on appeal, concerning the denial of the workmen's compensation coverage, constituted a waiver and abandonment of that claim. After this Court's decision in White II, Mrs. White, as executrix of Mr. White's estate, had two claims pending before the trial court, the claim for the amount due under the stacked policies ($110,000) and the claim alleging the misrepresentation of Mr. White's entitlement to stack.
On September 28, 1988, Georgia Casualty moved for summary judgment on the remaining fraud claim alleging a misrepresentation of Mr. White's entitlement to stack the uninsured motorist policies. Two days later, on September 30, 1988, Mrs. White, as representative of Mr. White's estate, moved for summary judgment with respect to the claim for $110,000 (12 vehicles × $10,000 per vehicle, less the $10,000 previously paid to Mr. White) for uninsured motorist benefits, citing this Court's decision in White I.
On December 21, 1988, before the trial court had ruled on the motions for summary judgment, Mrs. White, as the representative of Mr. White's estate, moved to amend her complaint a third time. She made two separate bad faith claims. First, *491 she alleged that Georgia Casualty had wrongfully tried to limit its liability by giving its agent authority to settle for only $7,500, when, at that time, June 24, 1984, it had admitted that the claim had a settlement value of $10,000. Also, she alleged that Georgia Casualty, in bad faith, had refused to pay or settle the claim for the amount due ($110,000) after the decision of White I and had done so with no legitimate or arguable reason for its refusal.
On December 28, 1988, the trial court entered separate orders on the summary judgment motions, granting Mrs. White's summary judgment motion and awarding her $110,000 in damages on the uninsured motorist claim and granting Georgia Casualty's motion as to the remaining fraud claim regarding the alleged misrepresentation of Mr. White's entitlement to stack. The fraud claim relating to the conspiracy to deny workmen's compensation benefits had been dismissed earlier. No notice of appeal was filed, and the judgment for $110,000, including prejudgment interest, was paid in January 1989. Neither party sought appellate review of the summary judgments. The case then proceeded to trial on the two bad faith claims alleged in the third amendment to the complaint, the claim of a bad faith offer to settle for $7,500, and the claim of a bad faith refusal to pay $110,000 for several months after White I.
After a trial on the merits, the jury returned a general verdict for $2,000,000 in favor of the estate of Mr. White on the bad faith claims, and the trial court entered its judgment thereon. Georgia Casualty moved for a judgment notwithstanding the verdict or, alternatively, for a new trial, or for remittitur. After a hearing in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), to test Georgia Casualty's assertion of "excessiveness of the verdict," the trial court denied Georgia Casualty's postjudgment motions, and Georgia Casualty brought the instant appeal.
Georgia Casualty raises the following issues: (1) whether this cause of action for bad faith survived Mr. White's death; (2) whether there was sufficient evidence to support the jury verdict; (3) whether the trial court erred in failing to grant a mistrial after counsel for Mrs. White made reference to offers of settlement; and (4) whether the jury verdict of $2,000,000 was excessive.

Survival Issue
Mrs. White alleged two incidents of bad faith in the third amendment to the complaint. The first was Georgia Casualty's alleged bad faith in authorizing its agent to settle for only $7,500 when it had at that time recognized the settlement value as $10,000. This claim is hereinafter referred to as the bad-faith-offer-to-settle claim. The second incident was Georgia Casualty's refusal to pay the limits of the stacked policies after this Court's decision in White I. This claim is hereinafter referred to as the bad-faith-refusal-to-pay claim. These two incidents will be discussed separately as they relate to the issue of survival.

Survival Generally
Georgia Casualty argues that the bad faith claims are "causes of action" and, therefore, that they do not survive the death of Mr. White. This Court has established the distinction between a personal "action," which will survive the death of the claimant, and a personal "cause of action," which will not survive the death of the claimant.
"[T]here is a distinction between `actions' [now claims upon which an action has been filed] and `causes of action' [now claims upon which no action has been filed]. An `action' is a proceeding pending in court to determine the parties' rights and liabilities with respect to a legal wrong or cause of action. A `cause of action' is a legal wrong for which an `action' may be, but has not been, brought in court."
McDowell v. Henderson Mining Co., 276 Ala. 202, 204, 160 So.2d 486, 488 (1963). Unfiled tort claims of the deceased do not survive his death. See Ala.Code 1975, § 6-5-462. Because the two bad faith claims were added after Mr. White's death, we must determine whether the bad faith *492 claims were Mr. White's personal causes of action, and, if so, whether the filing of those claims relates back to earlier pleadings in order to escape the operation of the survival statute.

Bad-faith-offer-to-settle claim
In the third amendment to the original complaint, Mrs. White, as representative of the estate of Mr. White, added a claim of bad faith in regard to an offer of settlement made by the agent of Georgia Casualty and authorized by Georgia Casualty. The complaint alleged that on or about June 22, 1984, Georgia Casualty had admitted in correspondence to its agent that the settlement value of the claim was $10,000, but it had authorized its agent to settle at or below $7,500. Mr. White died in October 1987. "A claim sounding in tort for which no action has been filed does not survive death in favor of the personal representative." Gillilan v. Federated Guar. Life Ins. Co., 447 So.2d 668, 674 (Ala.1984). Because the conduct of Georgia Casualty alleged to constitute a bad faith offer to settle occurred during Mr. White's lifetime, the question becomes whether the amendment adding this claim relates back to an earlier pleading made during Mr. White's lifetime.
Georgia Casualty contends that the bad-faith-offer-to-settle claim, first alleged in the third amended complaint, is barred by the survival statute, because, it says, that claim does not relate back, under Rule 15(c), A.R.Civ.P., to the original complaint, or amendments, filed before Mr. White's death. We agree that it does not relate back.
For an amendment to relate back to the original pleading, the claim asserted in the amendment must have arisen from the same conduct, transaction, or occurrence set forth in the original pleading. A.R. Civ.P. 15(c). Therefore, our inquiry is whether the occurrence set out in the third amendment arose from the same incident set forth in the pleadings filed prior to Mr. White's death.
In the first amendment to the complaint, the Whites alleged that on or about August 29, 1984, Georgia Casualty had worked a fraud upon them by representing that the claim limit was $10,000 per person, when, the Whites alleged, Georgia Casualty believed that Mr. White was entitled to stack and, therefore, believed that the amount available to Mr. White was $120,000. The third amendment, filed by Mrs. White as representative of Mr. White's estate, alleged that on or about June 22, 1984, Georgia Casualty, in bad faith, had offered to settle the claim for $7,500 when it believed the maximum amount due under the policy was $10,000. These two incidents are distinct in time. The Whites alleged that one incident, the alleged bad faith offer to settle, occurred on or about June 22, 1984, the date Mrs. White alleges Georgia Casualty authorized its agent to settle for $7,500 when it had admitted the claim was valued at $10,000, the maximum amount Georgia Casualty believed was available under the policy. The Whites alleged that the other incident, the alleged fraud relating to the representation that Mr. White was not entitled to stack, occurred on August 29, 1984, the date the Whites executed releases and accepted payment from Georgia Casualty for $10,000 each. Both incidents are alleged to have occurred before the decision of this Court in White I and before Mr. White's death.
Also, the two incidents are distinct in the conduct alleged to be wrongful. The first amendment, filed before Mr. White's death, alleged that Georgia Casualty had fraudulently misrepresented the maximum amount Mr. White could recover as $10,000, the limit of the policy without stacking. The third amendment, filed after Mr. White's death, alleged that Georgia Casualty had authorized its agent to settle for $7,500, even though it had admitted that the value of the claim was $10,000, the limit of the policy.
"An amendment dealing with conduct arising from a separate transaction or occurrence will not relate back." 1 C. Lyons, Alabama Rules of Civil Procedure Annotated 256 (2d ed. 1986) (citing Roney v. Ray, 436 So.2d 875 (Ala.1983)). Therefore, the third amendment, regarding the bad *493 faith offer to settle for $7,500, filed after Mr. White's death, does not relate back under Rule 15(c) because the fraud claim alleged in the first amendment, filed before Mr. White's death, and the bad-faith-offer-to-settle claim, filed after his death, are two distinct transactions, in time as well as in regard to the conduct alleged to be wrongful.
Because the claim regarding the alleged bad faith offer to settle does not relate back to the original pleading or to the amendments filed before Mr. White's death, this action does not survive his death, under § 6-5-462, Ala.Code 1975.

Bad faith refusal to pay
The other bad faith claim against Georgia Casualty was based on its alleged bad faith refusal to pay the total amount allowed by stacking after this Court's decision in White I. Georgia Casualty contends that this claim is also barred by Mr. White's death prior to the filing of the amendment raising this claim. However, because the conduct of Georgia Casualty alleged to give rise to the estate's claim of bad faith refusal to pay occurred after Mr. White's death, we conclude that the death of Mr. White does not affect whether the claim was properly brought by his estate, the entity Georgia Casualty was required to pay.
Before his death, Mr. White filed this action to recover money due from Georgia Casualty under the uninsured motorist coverage of the policy that insured his employer's trucks. The issues regarding the worth of his claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before this Court addressed the stacking issue in White I. The only determination left before Georgia Casualty was required to pay was whether Mr. White could stack; that issue was resolved in favor of Mr. White in White I. Before the judgment of this Court was certified, Mr. White died. At his death, the extent or worth of his claim was known to Georgia Casualty, and when this Court handed down its decision in White I, the amount Georgia Casualty was required to pay ($110,000) was established. When Mr. White died, his estate was the party entitled to be paid.
Assuming, without deciding, that after this Court's decision in White I and the death of Mr. White, Georgia Casualty had no reason to withhold payment, the claim for bad faith refusal to pay lies with Mr. White's estate, the party that Georgia Casualty was required to pay. After a loss is fixed, a policy of insurance becomes a contract for the payment. See Milwaukee Mechanics Ins. Co. v. Maples, 37 Ala.App. 74, 66 So.2d 159, cert. denied, 259 Ala. 189, 66 So.2d 173 (1953); United Security Life Ins. Co. v. Dupree, 41 Ala.App. 601, 146 So.2d 91 (1962). A proper party to be paid the proceeds from the contract when the insured has died and the policy of insurance has matured into a contract for payment is his estate. Therefore, an estate can maintain an action for bad faith refusal to pay a claim based upon a contract of insurance, to which the decedent was a party, when the bad faith occurs after the decedent's death in regard to the payment of a claim of the decedent that had matured into a contract to pay.
Mr. White's loss was fixed before his death in October 1987, and this Court's decision in White I on July 2, 1987 (rehearing denied February 12, 1988), held that Mr. White was entitled to stack the policies. Therefore, the amount Georgia Casualty was required to pay was established at the limit of the stacked policies ($120,000) less the amount previously paid ($10,000) or $110,000. The alleged bad faith refusal to pay the $110,000 after this Court's decision in White I gave rise to a claim by his estate for bad faith refusal to pay.
At the time White I was decided by this Court, two claims were pending: the claim for $110,000 uninsured motorist benefits, of which White I had just made a determination, and a fraud claim regarding the misrepresentation of Mr. White's entitlement to stack. Insisting that it was not bad faith to refuse payment of the stacked uninsured motorist benefits while the fraud action was still pending, Georgia Casualty argued:

*494 "In view of [Mrs. White's] refusal to negotiate in good faith towards the disposition of both claims, [Georgia Casualty] had no real choiceit was compelled to seek judicial adjudication of the pending claims. [Thus,] it acted within its legal rights in continuing to defend the [uninsured motorist] claim until [Mrs. White] proved the extent of [Mr. White's] injuries."
Georgia Casualty further argued that it, like any "prudent litigant," wished to compromise both the contract and the tort theories. Cliff Shepherd, Georgia Casualty's claims supervisor, testified that the essential reason Georgia Casualty did not pay the $110,000 stacked uninsured motorist benefits after the rendition of White I was Georgia Casualty's customary practice of concluding all claims together.
Since recognizing the tort of bad faith in Alabama, this Court has held that mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure. See King v. National Foundation Life Ins. Co., 541 So.2d 502 (Ala.1989); Pierce v. Combined Ins. Co. of America, 531 So.2d 654 (Ala. 1988); Coleman v. Gulf Life Ins. Co., 514 So.2d 944 (Ala.1987); Blue Cross & Blue Shield of Alabama v. Granger, 461 So.2d 1320 (Ala.1984); Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981).
We hold that the circumstances under which Georgia Casualty refused to pay the stacked uninsured motorist benefits, i.e., liability had been established and the amount had been established, do not, as a matter of law, constitute mere negligence or mistake. On March 1, 1988 (the date of the certificate of judgment in White I), Georgia Casualty's legal liability for "stacked" uninsured motorist benefits was established. Prior to the decision in White I, the record indicates, Georgia Casualty had knowledge that Mr. White was without fault for the accident and had been found to be totally disabled as a result of the accident.
Under the totality of these circumstances, the determination of whether Georgia Casualty's 10½-month delay in paying or offering to pay the full uninsured motorist benefits was for its own convenience, without a debatable reason or legal basis, presents mixed issues of law and fact. As a matter of law, once the stacking issue had been adjudicated, Georgia Casualty was stripped of any debatable reason for nonpayment. Yet, it further withheld payment and used this tactic to seek dismissal of the pending fraud claim. The ultimate issues of whether Georgia Casualty's payment was delayed with the intent to injure or whether, under these circumstances, the delay was reasonable, are issues of fact for the jury.
This action is peculiar in its procedural history, in that Mr. White died during the pendency of the appeal of White I and the alleged bad faith of Georgia Casualty occurred after his death. We do not hold that an action for bad faith refusal to pay can be maintained by an estate when the actions of the insurance company giving rise to the claim of bad faith refusal to pay occurred during the life of the insured. However, in this case, where the extent of liability and the extent of injury had been determined before the death of the insured, so as to convert the contract for insurance into a contract for payment, and facts sufficient to state a cause of action for bad faith refusal to pay have been alleged, we hold that the estate, the party entitled to be paid, can maintain an action for bad faith refusal to pay.

Mistrial Issue
Georgia Casualty next argues that its motion for mistrial should have been granted after counsel for the Whites referred, in the presence of the jury, to settlement negotiations regarding the bad faith claims. Generally, statements regarding settlement negotiations are considered to be highly prejudicial and are typically sufficient grounds for a mistrial. See Globe & Rutgers Fire Ins. Co. v. Pappas, 219 Ala. 332, 122 So. 346 (1929); Hester v. Ford, 221 Ala. 592, 130 So. 203 (1930).
However, this Court has held:

*495 "[E]ach case of this character must be decided upon its own merits and ... there is no horizontal rule by which these qualities can be ascertained in all cases. Much depends on the issues, the parties, and the general atmosphere of the particular case."
Kilcrease v. Harris, 288 Ala. 245, 249, 259 So.2d 797, 799 (1972). Before the Whites' counsel referred to the settlement negotiations regarding the bad faith claims, the trial court had admitted testimony, without objection, concerning prior settlement negotiations regarding the contract claim for $110,000. In denying Georgia Casualty's motion for a mistrial, the trial court based its decision on its conclusion that the jury probably did not understand the statement objected to as being anything different from the testimony regarding the prior settlement negotiations concerning the contract claim. Further, the trial court determined that any curative statements would serve only to bring the statement to the attention of the jury. The trial judge heard the testimony before, during, and after the statement by the Whites' counsel, and then made his decision to deny Georgia Casualty's motion for a mistrial upon a consideration of the "issues, the parties, and the general atmosphere of the particular case." Id.
In considering a motion for a mistrial, the trial judge has much discretion. On review, this Court will not reverse the trial court's denial of a motion for a mistrial based on a party's improper statements "unless it affirmatively appears from the entire record that the statements involved were probably prejudicial to the [complaining party], either as to the result or the amount of damages assessed." Birmingham Electric Co. v. Perkins, 249 Ala. 426, 430, 31 So.2d 640, 642 (1947) (emphasis added). The trial court's rationale in denying Georgia Casualty's motion is well based and, in reviewing the circumstances under which the allegedly prejudicial statement was made and the likelihood of any undue prejudice or bias resulting from it, we find no error in the trial court's denial of Georgia Casualty's motion for a mistrial.

Remittitur Issue
Because of this Court's holding, supra, that the bad-faith-offer-to-settle claim was barred by the survival statute, we conclude that the issue of remittitur is moot. Section 12-22-71, Ala.Code 1975, allows this Court to grant a remittitur when "the case should be reversed because the judgment of the lower court is excessive and ... there is no other ground of reversal." (Emphasis added.) In the case of Sarber v. Hollon, 265 Ala. 323, 91 So.2d 229 (1956), this Court held that even when a verdict is excessive, it is inappropriate to reduce the amount when the judgment is being reversed for another cause. Therefore, without regard to the merits of the excessiveness claim, we hold that remittitur is not appropriate in this case because the judgment of the trial court is reversed by this Court's decision.
In summary, we conclude that the claim of bad faith regarding Georgia Casualty's offer to settle for $7,500 at the time it considered the claim worth $10,000 did not survive Mr. White's death, and, therefore, that the trial court should not have sent this count to the jury. Because the jury returned a general verdict, we must decide whether the case is to be returned to the trial court or whether we, the reviewing court, can presume that the jury found only on the valid count.
In Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981), this Court held:
"[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
405 So.2d at 138. In American General Life & Accident Insurance Co. v. Lyles, *496 540 So.2d 696 (Ala.1988), we explained the holding of Aspinwall as follows:
"Where a trial court denies a defendant's motion for directed verdict on a count that is not supported by the evidence, a reviewing court may not presume that the jury returned its general verdict on a count that is supported by the evidence."
540 So.2d at 700. The inference is that, if the trial court is presented with the argument that the reviewing court eventually reverses on, then the presumption of Aspinwall will not apply and the case will be remanded for trial on the valid count.
We hold that this is the situation presented by the facts of this case. Specifically, Georgia Casualty filed a motion to dismiss or, in the alternative, for judgment on the pleadings; it filed a letter brief; and it presented the issue in its answer to the amendments alleging bad faith, contending that the bad faith claims did not survive Mr. White's death. After the jury returned a general verdict for $2,000,000 in favor of Mr. White's estate, Georgia Casualty again presented the issue to the trial court in its motion for JNOV or, in the alternative, motion for new trial, or, in the alternative, motion for remittitur and request for hearing.
Because the trial court was presented with the opportunity to rule squarely on the issue of whether the claims survived Mr. White's death and because the trial court failed to hold that the bad-faith-offer-to-settle claim did not survive Mr. White's death, as this Court has held, we cannot "presume" that the jury verdict is based upon the valid claim of bad faith refusal to pay. Therefore, we hold that the jury's general verdict cannot be presumed to be based on the valid count (the count alleging bad faith refusal to pay), when both counts were given to the jury after the trial judge had been informed of the infirmity of the invalid count, i.e., the bad-faith-offer-to-settle claim. Thus, we remand this case with instructions to the trial court to enter a judgment for the defendant Georgia Casualty on the bad-faith-offer-to-settle claim and to order a new trial, in accordance with this opinion, on the issue of bad faith refusal to pay.
We pretermit discussion of the sufficiency of the evidence, because of our holding regarding the survival issue. The trial court's judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., dissents.
MADDOX, Justice (dissenting).
When the tort of bad faith refusal to pay an insurance claim was recognized by this Court, this Court listed the following elements of a cause of action:
"(1) an insurance contract between the parties and a breach thereof by the defendant;
"(2) an intentional failure to pay the insured's claim;
"(3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(4) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(5) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982).
Today, the majority expands the tort of bad faith refusal to pay to include claims that are being litigated in court and misstates the law concerning the survivability of tort claims. I must respectfully dissent.
Summarized, the facts are as follows:
Johnny White and his wife were injured in an automobile accident on November 4, 1983, just a little over one year after the decision in Bowen, while he was driving a company vehicle that was covered under a fleet policy along with 11 other company vehicles. As pointed out in the majority *497 opinion, Mr. and Mrs. White each accepted, on September 12, 1984, payment of the basic $10,000 coverage, but both claimed a right to stack the fleet coverage (12 vehicles were included under the policy coverage), and on October 24, 1984, they filed their initial lawsuit against Farm Bureau Insurance Company, Georgia Casualty & Surety Company, and other fictitiously named defendants, and demanded "a trial by Struck Jury."
Five months later, on March 28, 1985, the Whites amended their complaint to claim that Georgia Casualty was guilty of bad faith in claiming that the Whites were not entitled to stack the fleet coverage on the uninsured motorist policies, but the trial court subsequently granted Georgia Casualty's motion for summary judgment on this fraud claim and on the contract claim. The effect of that judgment was to hold that the Whites were not entitled to stack the fleet coverage, the legal position advanced by Georgia Casualty on the motion for summary judgment. The summary judgment also dismissed the fraud claims. The court entered an order reading, in part, as follows:
"Pursuant to the findings above, the court determines that the plaintiffs are insureds of the second class and as such were entitled to the uninsured motorist coverage previously paid to them by defendant. However, their coverage as insureds of the second class is effectively limited by the limiting clause contained in the uninsured motorist provisions of the policy here in question and, therefore, plaintiffs cannot stack coverage.
"As authority for the aforesaid, citation of the following is in order: Section 32-7-23, Code of Alabama, 1975, as amended; Lambert v. Liberty Mutual Insurance Company, 331 So.2d 260 (Ala.1974); Nationwide Mutual Insurance Company v. United Services Automobile Association, 359 So.2d 380 (Ala. 1978); Holloway v. Nationwide Insurance Company, 376 So.2d 690 (Ala.1978); and Fuqua v. Travelers Insurance Company, 734 F.2d 616 (11th Cir.1984).
"The court further finds there is no genuine issue in this action as to any material fact and the defendant is entitled to summary judgment as a matter of law."
At the time this order was entered, Georgia Casualty had a judicial determination that was consistent with the position it had taken, that neither of the Whites was entitled to stack. Clearly, there was no bad faith on Georgia Casualty's part in asking for a summary judgment on the question of the legal right of the Whites to stack the fleet coverage.
The order issued by the trial judge on December 19, 1985, dismissed not only the contract claim but also the fraud claims of the Whites. The Whites then appealed to this Court, and this Court, in White v. Georgia Casualty & Surety Co., 520 So.2d 140 (Ala.1988) (White I) held that Mr. White could stack, but refused to permit Mrs. White to stack the coverages. As pointed out in the majority opinion in this case, "[t]he Whites' application for rehearing [in White I] was denied on February 12, 1988, and the certificate of judgment was issued on March 1, 1988." Majority Op. at 489-490. In White I, this Court did not address the fraud claims, even though those claims had been dismissed by the summary judgment order. The majority correctly admits that "White I addressed only the `entitlement to stack' issue, leaving uncertainty as to any appellate disposition of the two fraud claims that had been alleged in the first and second amended complaints." Op. at 490. Consequently, there was "uncertainty" as to just which claims had been decided by White I, and which claims were still pending after remand. It is clear that when the certificate of judgment was issued by this Court, the case was remanded not rendered; therefore, this Court did not order the policy limits to be paid.
Even though Georgia Casualty lost its case on appeal insofar as Mr. White was concerned, it was not bad faith for Georgia Casualty to present its position on appeal.
It is undisputed now that when this Court reversed and remanded Mr. White's case, Mrs. White's claim on the contract *498 and her fraud claims were not pending, because the summary judgment as to her claims was affirmed by White I. What was pending insofar as Mr. White was concerned? The summary judgment against him had been reversed and the cause remanded; therefore, his contract claim to recover the stacked policy limits ($110,000) was definitely pending, and it was later judicially determined that one of his fraud claims was still pending.
It is uncontroverted that when Mr. White's contract claim was remanded, Georgia Casualty had previously filed an answer to the initial complaint in which it denied the allegations of Mr. White's complaint on the contract claim; therefore, Georgia Casualty, at that point, had a legal right to insist that Mr. White prove that his injuries and damages were caused by an uninsured motorist, and the record is clear that the amount of damages attributable to the accident was in dispute. The majority's finding to the contrary is not supported by the record. Also, as the majority admits, there was "uncertainty" concerning the disposition of the fraud claims, and this "uncertainty" was exacerbated by the fact that Mr. White had died while the matter was on appeal in this Court.
Furthermore, Mrs. White, in her representative capacity, made several discovery requests, "in an apparent attempt to uncover information relating to their fraud claims,"[1] but insofar as I can tell, Mrs. White did not take any action to have the trial court enter a judgment on the contract claim that was then pending. Georgia Casualty objected to the discovery request by Mrs. White, on the ground that fraud was no longer an issue in the case. The trial court denied Georgia Casualty's request for a protective order, and Georgia Casualty petitioned this Court for a writ of mandamus. See Ex parte Georgia Cas. & Sur. Co., 531 So.2d 838 (Ala.1988). In that case, this Court said, regarding the "first fraud claim" (that Georgia Casualty had misrepresented to the Whites that stacking was not allowed under the terms of the policy):
"When this Court held that Mr. White was entitled to stack coverage and, thus, reversed the summary judgment as to him, the first fraud claim was reinstated to the extent that it related to alleged misrepresentations concerning the extent of his coverage."
531 So.2d at 841.
A close reading of White II, however, shows that its basic holding is that this Court was not convinced that the trial judge had abused his discretion in refusing to limit discovery on the fraud claim. Clearly, White II was not a mandate that Georgia Casualty pay the pending contract claim, only a holding that discovery could proceed. In fact, it appears to me that the strategy of the plaintiff when the mandate of this Court was issued in March 1988, was to try both the contract and the fraud claims before a jury, because the record shows that the plaintiff was making trial preparations and was not seeking immediate payment of the $110,000. Insofar as I can tell, the plaintiff and defendant were engaging in activities not inconsistent with trial preparations in any case that is pending in court. For example, there is evidence in the record of negotiations between the parties, encouraged by the trial court, to try to settle the case, including both the fraud claim and the contract claim in White I, and there is evidence that Georgia Casualty made several offers to the plaintiff in an attempt to settle the case, but that these offers were not accepted. In fact, the evidence is that plaintiff did not even respond to them, negatively or otherwise. As the majority states, it was not until this Court decided White II that "Mrs. White, as representative of Mr. White's estate, moved for summary judgment with respect to the claim for $110,000 (12 vehicles × $10,000 per vehicle, less the $10,000 previously paid to Mr. White) for uninsured motorist benefits" and took official action to get a summary judgment entered on the contract claim. Maj.Op. at 490. This motion for summary judgment was filed on September *499 30, 1988, six months after this Court's mandate in White I, and was the only official action by the plaintiffs to recover on the contract claim. For this Court to hold that, based on these facts, there was no debatable issue on the extent of the plaintiffs' damages is most regrettable.[2]
Georgia Casualty had contemporaneously filed a motion for summary judgment on the fraud claim that was still pending in which the plaintiffs claimed that Georgia Casualty had acted in bad faith by offering only $7,500 in June 1984 to settle the original uninsured motorist claim. On December 8, 1988, while these cross-motions for summary judgment were under submission, Mrs. White, in her representative capacity, sought to amend her complaint to add a claim of bad faith, in which she averred that Georgia Casualty had continued to refuse to pay the uninsured motorist claim after this Court's decision in White I, the very issue that was under submission on her summary judgment motion that the court had not yet decided. On December 28, 1988, the trial court entered separate orders on the summary judgment motions of the parties, entering a summary judgment for the plaintiff on her contract claim and a summary judgment for Georgia Casualty on the fraud claim that was pending. The Court, however, did what I consider to be legally impermissible; it also permitted the amendment that plaintiff filed during the time the summary judgment motion was under submission.
When the trial court, on December 28, 1988, entered a summary judgment for the plaintiff on her contract claim, that was the first time the plaintiff had a court order that entitled her to the $110,000 on her contract claim initially filed by her husband.[3] The majority states that Georgia Casualty can be penalized with a $2,000,000 judgment because it did not immediately pay the $110,000 after this Court issued its mandate in White I. The Court unfortunately ignores the fact that a contract action was pending, in which plaintiff had demanded a trial by jury. If the plaintiff was entitled to a summary judgment on the contract claim when White I was decided, why did she wait six months before filing her contract claim or any evidence supporting that claim? The better question is: If there was no debatable question about liability and the extent of Mr. White's damages in October 1984, when the suit was filed, why did Mr. White not ask for a partial summary judgment at that time, so that the stacking issue would have been the only controverted issue in the lawsuit?
This Court, unfortunately, does not place any burden on the plaintiff to prove the claim she filed but shifts the burden to the defendant and essentially holds that an insurer can be guilty of a bad faith failure to pay a claim even though the alleged acts of bad faith occurred while the whole matter of entitlement was in litigation, either in the trial court or in this Court, because it is undisputed that the majority opinion is premised upon the fact that Georgia Casualty did not pay to its insured the $110,000 of "stacked" coverage as soon as the certificate of judgment was entered by this Court in White I. The majority states in its opinion:
"Before his death, Mr. White filed this action to recover money due from Georgia Casualty under the uninsured motorist coverage of the policy that insured his employer's trucks. The issues regarding the worth of his claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before *500 this Court addressed the stacking issue in White I. The only determination left before Georgia Casualty was required to pay was whether Mr. White could stack; that issue was resolved in favor of Mr. White in White I. Before the judgment of this Court was certified, Mr. White died. At his death, the extent or worth of his claim was known to Georgia Casualty, and when this Court handed down its decision in White I, the amount Georgia Casualty was required to pay ($110,000) was established. When Mr. White died, his estate was the party entitled to be paid."
Op. at 490.
The majority's conclusion that Georgia Casualty should have paid its policy limits as soon as this Court issued its opinion in White I, when the plaintiff's entitlement to the full policy limits was not legally determined until the trial court granted the plaintiff's motion for summary judgment, is very disturbing. First, it is disturbing in that it misconstrues the holding of White I. The only issue decided in White I was the right of the insured to "stack" coverages, not the extent of the insured's damages.
That issue was not finally resolved against Georgia Casualty until Georgia Casualty failed to appeal from the summary judgment entered some nine months after the certificate of judgment was issued in White I, and while plaintiff's contract claim, on which she had demanded a jury trial, was still pending, along with other claims. Second, the decision is disturbing in that it permits a party who has been substituted in a representative capacity to file an amendment alleging a tort claim and to have it relate back, when the only claim to which it could relate is a tort claim that was filed by the deceased, a claim that was dismissed.
The majority states the following:
"The other bad faith claim against Georgia Casualty was its alleged bad faith refusal to pay the total amount allowed by stacking after this Court's decision in White I. Georgia Casualty contends that this claim is also barred by Mr. White's death prior to the filing of the amendment raising this claim. However, because the conduct of Georgia Casualty alleged to give rise to the estate's claim of bad faith refusal to pay occurred after Mr. White's death, we conclude that the death of Mr. White does not affect whether the claim was properly brought by his estate, the entity Georgia Casualty was required to pay.
"Before his death, Mr. White filed this action to recover money due from Georgia Casualty under the uninsured motorist coverage of the policy that insured his employer's trucks. The issues regarding the worth of his claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before this Court addressed the stacking issue in White I. The only determination left before Georgia Casualty was required to pay was whether Mr. White could stack; that issue was resolved in favor of Mr. White in White I. Before the judgment of this Court was certified, Mr. White died. At his death, the extent or worth of his claim was known to Georgia Casualty, and when this Court handed down its decision in White I, the amount Georgia Casualty was required to pay ($110,000) was established. When Mr. White died, his estate was the party entitled to be paid.
"Assuming, without deciding, that after this Court's decision in White I and the death of Mr. White, Georgia Casualty had no reason to withhold payment, the claim for bad faith refusal to pay lies with Mr. White's estate, the party that Georgia Casualty was required to pay."
Op. at 490.
That holding is erroneous for at least the following reasons: (1) the record shows, without question, that there had not been a legal determination of Georgia Casualty's obligation to pay the $110,000 until the trial court entered its order in December 1988, based on a motion for summary judgment on the contract claim, filed by the plaintiff, in her representative capacity; and (2) the bad faith claim upon which the judgment was entered did not survive.
*501 Admittedly, the question of Mr. White's right to stack coverages had been determined when this Court issued its certificate of judgment in White I, but the majority's conclusion that "[t]he issues regarding the worth of [Mr. White's] claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before this Court addressed the stacking issue in White I," Op. at 490, is inaccurate. If that statement is true, the plaintiff should have asked this Court to render a judgment in White I and order the payment of the policy limits. On the other hand, if the plaintiff could prove entitlement to the full amount of the coverage, the plaintiff should have filed a motion for summary judgment on the contract claim as soon as proof could be made to show that no material issue of fact remained in the case. Georgia Casualty should not be penalized for the plaintiff's lack of diligence. I believe that the Court establishes a dangerous precedent in saying that the insurer should have paid a claim that was pending in court, even though the plaintiff had taken no official action to have it paid.
Our opinions in Quick v. State Farm Mut. Auto. Ins. Co., 429 So.2d 1033 (Ala. 1983), Bowers v. State Farm Mut. Auto. Ins. Co., 460 So.2d 1288 (Ala.1984), and Aetna Cas. & Sur. Co. v. Beggs, 525 So.2d 1350 (Ala.1988), are direct authority for holding that "there can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover [damages from an uninsured or underinsured motorist]." Quick, 429 So.2d at 1035.
The majority also concludes, even though the trial court correctly dismissed the fraud claim that had been filed against Georgia Casualty, that "in this case, where the extent of liability and the extent of injury had been determined before the death of the insured, [that is sufficient] to convert the contract for insurance into a contract for payment, and facts sufficient to state a cause of action for bad faith refusal to pay have been alleged," and "that the estate, the party entitled to be paid, can maintain an action for bad faith refusal to pay." Op. at 491. That is new law that I believe runs afoul of the principles of law set forth in McDowell v. Henderson Mining Co., 276 Ala. 202, 160 So.2d 486 (1963).
Assuming that the personal representative of an estate can maintain an action for bad faith failure to pay an insurance claim, as the majority holds,[4] I fail to see how the amendment to the complaint in this case constituted a suit by the estate. It appears to me that the amendment was filed by the personal representative on behalf of Mr. White and that it alleged wrongful conduct on behalf of Georgia Casualty after his death.
This Court's decision allowing the amendment establishes a dangerous precedent relating to the survivability of tort claims, and permits a personal representative to stand in the shoes of a tort plaintiff who has died, and state a claim for wrongful conduct allegedly committed against the tort plaintiff after his death. As I construe Rule 15(c), A.R.Civ.P., an amendment relates back only when the claim asserted (here, failure to pay the $110,000 after this Court decided White I) arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading (misrepresenting that the coverages could not be stacked).
Even if the personal representative had a cause of action against Georgia Casualty for refusal to pay, it would appear to me that it would have to be filed as a separate action, not as an amendment to a pending action. Otherwise, the law relating to survivability of tort claims and the procedural rules relating to pleadings and parties would be confused.
In any event, I do not believe that Georgia Casualty's failure to pay the contract claim that was pending in court awaiting trial by jury was conduct, even if wrongful, *502 that would relate back to alleged bad faith conduct occurring before Mr. White died, and as stated above, until the trial court granted the motion for summary judgment on the contract claim, Georgia Casualty was not under a legal obligation to pay.
From the beginning, I have been concerned that the tort of bad faith refusal to pay may not have been the best alternative for this Court to adopt. Nevertheless, the tort of bad faith has been established, and it is now the law of this state, but the opinion issued today expands the tort to include conduct that I believe was not envisioned when the tort was created. I also believe that the opinion establishes some procedural law relating to the survivability of tort claims that is a departure from current law. Those are the reasons for my dissent.
Even though I dissent on the law, I would agree to permit this plaintiff a reasonable attorney fee for the time and effort required to establish entitlement to the amount finally awarded on the contract claim. See my special concurrence in Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1054 (Ala.1987).
NOTES
[1] See Ex parte Georgia Cas. & Sur. Co., 531 So.2d 838, 840 (Ala.1988), the mandamus case, in which Georgia Casualty contended that the fraud claims were extinguished by the decision in White I.
[2] The record suggests that there was some evidence that the kidney disease that caused Mr. White's death may have been a preexisting condition, and there was evidence that he did return to work. I realize that the trial court, after the plaintiffs produced evidence in support of their motion for summary judgment, did grant that motion, and that Georgia Casualty did not appeal, but that does not mean that summary judgment was appropriate. We frequently reverse summary judgments.
[3] In view of the fact that the trial court entered an order pursuant to Rule 54(b), Ala.R.Civ.P., the order in favor of the plaintiffs became final when Georgia Casualty did not appeal. Consequently, any dispute Georgia Casualty might have had relating to the extent of Mr. White's damages related to the policy coverage was foreclosed when no appeal was taken.
[4] I have not researched the law to determine whether a personal representative can file a bad faith claim, and I do not know to whom any punitive damages in such a case would be distributed, in view of the laws that regulate the receipt and distribution of funds belonging to the estate.