686 So.2d 231 (1996)
Ian MALCOLM and Ian Malcolm, M.D., P.C.
v.
Terry Grant KING, as Executor of the Estate of J. Willard King, Deceased.
1950693.
Supreme Court of Alabama.
December 6, 1996.
*232 Thomas W. Christian, Deborah Alley Smith, and Jane Greene Ragland of Rives & Peterson, Birmingham, for Appellants.
J. Gusty Yearout, Deborah S. Braden, C. Jeffery Ash, and John G. Watts of Yearout, Myers & Traylor, P.C., Birmingham; and Oliver Frederick Wood and R. Wyatt Howell of Green, Wood, Howell & Glenn, Hamilton, for Appellee.
PER CURIAM.
This is a medical malpractice case involving claims for personal injury and wrongful death. Ian Malcolm, M.D., and Ian Malcolm, M.D., P.C. (hereinafter sometimes referred to collectively as "Dr. Malcolm"), appeal from a judgment entered on a jury verdict in favor of Terry Grant King, the executor of J. Willard King's estate.

I. Facts
The evidence, viewed in the light most favorable to the plaintiff, Terry King, Bussey v. John Deere Co., 531 So.2d 860 (Ala.1988), shows the following: While driving his pickup truck on the evening of September 16, 1991, Willard King suffered personal injuries in a collision with a motor vehicle driven by Scott Mixon. Emergency personnel fixed King to a backboard and placed a cervical collar around his head and neck. King was transported to the Marion County General Hospital emergency room, where he complained of pain in his back and neck and said that he could move his toes, but not his legs. However, Dr. Johnny Bates, the emergency room physician, determined that King could move his legs and that King's sensations were normal. King smelled of alcohol, and a blood alcohol test determined that he was legally intoxicated. Dr. Bates examined King, but could find nothing physically wrong with him. Dr. Bates also ordered X-rays of King's chest, cervical spine, and lumbar spine.
The hospital's X-ray technicians had some difficulty obtaining X-rays of King, particularly one showing the lateral view of King's cervical spine that would display all 7 cervical vertebrae. The X-ray they took showed only the first 5 cervical vertebrae, missing a view of the lowermost cervical vertebrae, C-6 and C-7. Dr. Bates examined King's X-rays and determined that there were no fractures. However, because he was unable to view the C-6 and C-7 vertebrae on lateral view and fully rule out a fracture of King's cervical spine, Dr. Bates ordered a "swimmer's view" X-ray of King's cervical spine. That X-ray showed the C-6 and C-7 vertebrae, and after examining it and the other X-ray Dr. Bates saw no fractures. It is undisputed, however, that King had suffered fractures of his C-2 and C-6 vertebrae.
Although Dr. Bates had not diagnosed any spinal fractures or neurological deficiency, he admitted King to the hospital because he believed King was still under the effects of alcohol and because he suspected that a neurological problem might be detected later. Dr. Bates ordered that King be kept in a cervical collar and that neurological checks on him be done periodically. Dr. Bates then telephoned Dr. Carrol Sasser, King's personal physician, and informed him of King's accident, that X-rays had been taken of King, and that he could not find anything physically wrong with King, but that he had admitted King so that King's condition could be evaluated *233 when King was no longer under the influence of alcohol.
King was taken to his hospital room around 8:00 p.m., and a nurse's evaluation done at that time indicated that he was suffering weakness in his left shoulder, but otherwise had an active range of motion. Dr. Sasser examined King and his X-rays, but did not see any fractures indicated on the X-rays. King complained of pain all over and was given pain medication. Dr. Sasser ordered that periodic checks be done of King's vital signs and neurological conditions.
The next morning, September 17, Dr. Ian Malcolm, a board certified radiologist, went to the hospital and reviewed all the X-rays that had been taken the night before, as was his usual practice. Sometime between 9:00 and 10:00 a.m., Dr. Malcolm examined King's cervical X-rays, but identified no fractures. He spoke with Dr. Sasser, then ordered a CAT scan of King's cervical spine. Dr. Malcolm examined the results of the CAT scan, but again diagnosed no fractures in King's cervical spine. As noted previously, it is undisputed that King had suffered cervical fractures as the result of the automobile collision, and at trial expert medical testimony was presented indicating that Dr. Malcolm had breached the appropriate standard of medical care for a radiologist by failing to recognize those fractures, which were indicated on the X-rays taken at Marion County General Hospital.
In Dr. Sasser's evaluation of King that morning, he noted that King looked better, but that he was still experiencing pain in his neck, shoulder, and arms, that he was also sluggish in moving his arms, and that his grip was weak. Dr. Sasser ordered physical therapy for King.
A physical therapist saw King at about 8:00 a.m. the following morning, September 18. At that time King, who was still in a cervical collar, could not fully sit up in bed; he complained that he could not feel his hands. He also complained of pain in his neck and shoulders. His pulse rate was only 48, having fallen from 64 at midnight. The therapist performed a gross manual muscle test on King, which indicated to her that he was not a candidate for physical therapy because she noted considerable weakness in his arms and some weakness in one leg. She believed that King could not be a candidate for therapy until the cause of his muscle weakness was determined.
By about 9:00 a.m. that morning, King's pulse rate had fallen to 38. Because of King's worsening neurological condition, Dr. Sasser ordered that King be transferred to the University of Alabama at Birmingham Medical Center ("UAB").
When he arrived at UAB on the afternoon of September 18, King was put under the treatment of Dr. Winfield Fisher, a neurosurgeon. Dr. Fisher ordered lateral cervical X-rays of King. Upon viewing those X-rays, Dr. Fisher determined that King had suffered a fracture of his C-2 vertebra and a fracture subluxation of his C-6 vertebra. A subluxation of a cervical vertebra occurs when one vertebra is displaced over an adjacent vertebra so that pressure is placed on the person's spinal cord and the cord is damaged. Dr. Fisher ordered that King be placed in traction, to immobilize his neck and to prevent further neurological damage. However, King was later removed from traction while he experienced an episode of delirium tremens from alcohol withdrawal.
On September 23, Dr. Fisher performed an operation that fused a portion of King's cervical vertebrae in order to stabilize his neck. Even after the operation, King continued to suffer from severe neurological deficiencies and related health problems. He was classified as a quadriparetic, a person with permanent neurological deficiencies in both lower and upper extremities. King was transferred to the Spain Rehabilitation Center on December 30, 1991; he died on January 16, 1992, from complications of his neurological injury. His death certificate listed his cause of death as quadriparesis with cardiopulmonary compromise, spinal cord injury, cervical vertebral fracture, and a motor vehicle accident.
On October 31, 1991, Willard King and his wife Ethel King had filed a complaint against Scott Mixon, the driver of the vehicle that had struck King's truck, and Stanley Mixon, Scott's father. The complaint alleged negligence *234 and wantonness on the part of Scott Mixon, and negligent or wanton entrustment by Stanley Mixon. It also made several other claims also relating to the automobile collision, including a claim for uninsured motorist coverage with State Farm Mutual Automobile Insurance Company.
After King's death, Terry Grant King, his son and the executor of his estate, was substituted for Willard King in the pending action. Thereafter, on September 29, 1992, the complaint was amended to add claims alleging that King had suffered personal injuries and wrongful death as the result of medical malpractice. The complaint eventually named as defendants Marion County General Hospital; Southern Health Corporation, Inc.; Southern Health Corporation of Hamilton, Inc.; Dr. Johnny Bates; Dr. Ian Malcolm; Ian Malcolm, M.D., P.C.; the University of Alabama Health Services Foundation; and Dr. Winfield Fisher. The amended complaint alleged that the medical defendants had breached their duty of care by failing to recognize that Willard King had suffered cervical fractures in the automobile collision, that they had failed to give him proper treatment for cervical fractures, and that their actions had caused him to suffer neurological injury and death.
In April 1993, a suggestion of death was filed on behalf of Dr. Sasser, and his estate was later dismissed from the lawsuit. In May 1993, Terry King, as executor of Willard King's estate, reached a pro tanto settlement with the Mixons and State Farm for $65,000, executed a release, and dismissed them from the lawsuit. In May 1994, the trial court entered a summary judgment for the University of Alabama Health Services Foundation and Dr. Fisher; that judgment was made final and was not appealed.
The case went to trial in August 1995. The theory of Terry King's claims against Dr. Bates and Dr. Malcolm was that they had failed to recognize the cervical fractures indicated on the X-rays taken upon Willard King's arrival at Marion County General Hospital, and that that failure resulted in a failure to properly treat his fractures and thereby proximately caused subluxation of his cervical vertebrae, the resulting permanent neurological injury, and death. At the close of the plaintiff's case and again at the close of the evidence, both Dr. Bates and Dr. Malcolm moved for a directed verdict. The trial court denied their motions. Before the case went to the jury, Terry King reached a pro tanto settlement with Marion County General Hospital and the Southern Health Corporation defendants for $450,000, executed a release, and dismissed them from the lawsuit. The jury was unable to reach a verdict in relation to Dr. Bates, and the trial court declared a mistrial as to the claims against him. The jury returned a verdict against Dr. Malcolm, awarding $750,000 in compensatory damages for King's personal injuries. The jury also assessed $765,000 in punitive damages against Dr. Malcolm on the wrongful death claim. As they had been instructed by the trial court, the jury subtracted the $515,000 Terry King had already recovered from other defendants, leaving a $1,000,000 verdict against Dr. Malcolm. The trial court entered a judgment on the jury verdict, and thereafter denied Dr. Malcolm's motion for a JNOV or a new trial. Dr. Malcolm appeals from the judgment.

II. Issues
Dr. Malcolm raises several issues on appeal: (1) whether the personal injury claim against him survived King's death; (2) whether the trial court erred in denying Dr. Malcolm's motion for a directed verdict, based on the alleged insufficiency of the evidence, and in submitting the personal injury claim (if it survived) and the wrongful death claim to the jury; and (3) whether the trial court erred in denying Dr. Malcolm's motion for a new trial on the wrongful death claim on the ground that the verdict was against the weight of the evidence, or based on the alleged prejudicial effect of evidence of Willard King's pain and suffering admitted in relation to the personal injury claim.

III. Did the Personal Injury Claim Survive?
Terry King's claims against Dr. Malcolm were based on allegations of medical malpracticethat Dr. Malcolm had breached the standard of care for a radiologist by *235 failing to recognize cervical fractures that were revealed on the X-rays taken of Willard King upon his admission to Marion County General Hospital following the automobile collision. The complaint further alleged that because of Dr. Malcolm's negligence, King was caused to proximately suffer personal injury and, eventually, death. Dr. Malcolm argues that the trial court erred in denying his motions for a directed verdict on the personal injury claim against him and in submitting that claim to the jury. Dr. Malcolm notes that although King died on January 16, 1992, the complaint was not amended to allege a claim for personal injuries against him until September 29, 1992. Dr. Malcolm points out that under Ala.Code 1975, § 6-5-462,[1] the "survival statute," an unfiled tort claim will generally not survive the death of the person with the claim. Thus, Dr. Malcolm argues that the claim based on King's personal injuries allegedly caused by Dr. Malcolm's medical malpractice did not survive King's death and should not have been submitted to the jury. Relying on King v. National Spa & Pool Institute, 607 So.2d 1241 (Ala.1992),[2] Dr. Malcolm argues that the personal injury action against him did not survive King's death because that claim was not filed before King's death.
In response, Terry King says that the trial court did not err in denying the directed verdict motion based on Dr. Malcolm's assertion that the personal injury action did not survive. Terry King argues that the claim for personal injuries suffered by his father as the result of Dr. Malcolm's alleged malpractice survived his father's death because, he says, under Rule 15(c)(2), Ala.R.Civ.P., the personal injury claim against Dr. Malcolm relates back to October 31, 1991before his father's deaththe date the claim for personal injuries was filed against the Mixons and State Farm. Rule 15 states:
"(c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when
"(1)....
"(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...."
Terry King argues that the personal injuries suffered by his father as the result of alleged malpractice by Dr. Malcolm arose from the same "transaction or occurrence" as the personal injuries his father suffered because of Scott Mixon's alleged negligence in causing the motor vehicle accident and, thus, relate back under Rule 15(c)(2).
The trial court denied Dr. Malcolm's motion for a directed verdict on the claim for Willard King's personal injuries, without entering a written order. However, implicit in that ruling was a finding that the personal injury claim against Dr. Malcolm arose from the same transaction or occurrence as set forth in the original complaint against the Mixons and other defendants and, thus, that it related back under Rule 15(c)(2) to the date of the original complaint filed before Willard King's death. We must determine whether that finding is correct.[3]
In National Spa, supra, this Court stated:
"Specifically, we hold that the survival statute, Ala.Code 1975, § 6-5-462, means exactly what its plain language states, that `all personal claims upon which an action has been filed ... survive in favor of and *236 against personal representatives....' (Emphasis supplied in National Spa.) The fact that the injury that serves as the basis for the personal injury action later gives rise to a wrongful death claim does not extinguish the original personal injury claim."
607 So.2d at 1246. However, National Spa did not answer the question presented herewhether a personal injury claim, upon which an action is filed on behalf of the decedent after his death, survives the death of the decedent by relating back under Rule 15(c)(2) to the date of the filing of the decedent's complaint alleging a personal injury claim against a different defendant filed before the decedent's death.
The general rule is that under Ala.Code 1975, § 6-5-462, an unfiled tort claim does not survive the death of the person with the claim. In Georgia Casualty & Surety Co. v. White, 582 So.2d 487 (Ala.1991), this Court discussed the effect of Rule 15(c)(2) and the circumstances under which an amendment to a decedent's complaint, filed after the decedent's death, would relate back to the date of the filing of the original complaint filed before death:
"For an amendment to relate back to the original pleading, the claim asserted in the amendment must have arisen from the same conduct, transaction, or occurrence set forth in the original pleading. A.R.Civ.P. 15(c). Therefore, our inquiry is whether the occurrence set out in the ... amendment arose from the same incident set forth in the pleadings filed prior to [the decedent's] death."
582 So.2d at 492 (emphasis added). In White, this Court ruled that an amendment adding a claim alleging bad faith failure to pay under an insurance policy did not relate back to the fraud claim alleged in an earlier amendment filed before the decedent's death because the claims involved two "distinct transactions, in time as well as in regard to the conduct alleged to be wrongful." Id. at 493.
The acts that formed the basis for the medical malpractice claim against Dr. Malcolm were distinctly different, both in time as well as in regard to conduct, from the acts that formed the basis for the personal injury claim filed on October 31, 1991, by Willard King and his wife against the Mixons and State Farm. We conclude, therefore, that the amendment to the complaint filed after Willard King's death, alleging medical malpractice against Dr. Malcolm, does not arise from the same "incident," White, supra, as that alleged in the original complaint filed before King's death. Accordingly, we hold that the amendment to the complaint did not relate back under Rule 15(c)(2) to the date of the original complaint and, therefore, that the personal injury claim against Dr. Malcolm did not survive Willard King's death. In so holding, we note that the plaintiff's reliance on Williams v. Woodman, 424 So.2d 611 (Ala.1982), Ex parte Rudolph, 515 So.2d 704 (Ala.1987), and Ex parte Jenkins, 510 So.2d 232 (Ala.1987), is misplaced. Those cases stand for several basic propositions, none of which is pertinent to the issue presented here. First, Williams and Rudolph expressly recognize that where a person is injured by the negligent or wrongful act of another, and the injured person uses ordinary care in endeavoring to obtain medical treatment and in selecting medical and surgical help, but the injury is aggravated by negligence or unskillfulness on the part of the medical personnel, the party causing the original injury will be responsible for the resulting damages to its full extent. This rule is based on the principles that a defendant is liable for all the foreseeable injuries caused by his negligence and that it is foreseeable that an injured party will receive negligent medical care. Second, in the scenario stated above, Rudolph and Jenkins hold that the plaintiff's claim against the party causing the original injury and the plaintiff's malpractice claim arise out of a "series of ... occurrences" and may, under Rule 20, Ala.R.Civ.P. ("Permissive Joinder of Parties"), be joined in one action. Third, Williams and Rudolph acknowledge the well-established rule that a plaintiff can recover only once for a single injury. However, none of these cases stands for the proposition that the circumstances surrounding an injury-causing accident and the circumstances surrounding the subsequent negligent medical treatment for the injury constitute the same "conduct ... or *237 occurrence," so as to invoke the relation-back doctrine set out in Rule 15(c)(2).

IV. Sufficiency of the Evidence

A. Standard of Review
Dr. Malcolm also argues that the trial court erred in denying his motions for a directed verdict on the wrongful death-medical malpractice claim. The standard of review applicable to a motion for a directed verdict is whether the nonmovant has presented substantial evidence in support of each element of his claim; if he has not, then a directed verdict is proper. Parker v. Collins, 605 So.2d 824 (Ala.1992). To prove liability in a medical malpractice case, the plaintiff must prove by expert testimony that the physician breached the appropriate standard of care and that the breach proximately caused the injury complained of. University of Alabama Health Services Found., P.C. v. Bush, 638 So.2d 794 (Ala.1994). Further, under Ala.Code 1975, § 6-5-484(a), the expert testimony must come from a physician in the same general line of practice as the defendant physician. However, as noted previously, in reviewing a trial court's ruling on a directed verdict motion, this Court must view the evidence in a light most favorable to the nonmovant, in this case Terry King. Bussey v. John Deere Co., supra.

B. Discussion
Dr. Malcolm argues that the trial court erred in denying his motions for a directed verdict on the wrongful death-medical malpractice claim, contending that Terry King did not present substantial evidence in support of all the elements of that claim. Specifically, Dr. Malcolm argues that Terry King did not meet his burden of proof on the issue of medical causation by presenting substantial evidence that Dr. Malcolm's failure to recognize Willard King's cervical fractures when he read Willard King's X-rays the morning after the automobile collision probably caused King to suffer irreversible neurological damage and, later, death. Dr. Malcolm argues that Willard King's irreversible neurological injury occurred either on the date of the collision, before he ever viewed King's X-rays, or approximately two weeks later when, he says, King suffered a spinal cord stroke incident to his episode of delirium tremens. Dr. Malcolm points to trial testimony by his expert witness that the delirium tremens caused King to suffer a spinal cord stroke and permanent neurological injury. Alternatively, Dr. Malcolm argues that the trial court erred in denying his motion for a new trial because, he says, the jury's verdict was against the weight of the evidence.
Terry King argues that he presented substantial evidence by expert medical testimony that Willard King's permanent neurological injury was caused by the subluxation of King's cervical vertebrae, which the expert testimony indicated began occurring a short time after Dr. Malcolm failed to recognize the fractures indicated on King's initial X-rays. Terry King refers to expert medical testimony indicating that if Willard King's fractures had been recognized by Dr. Malcolm and properly treated before the subluxation, King would have recovered from the spinal fractures without permanent neurological injury. He also points to expert medical testimony indicating that Willard King's neurological injury and resulting paralysis led to an extended period of bed rest and immobility that caused King to suffer a fatal pulmonary embolism.
After thoroughly reviewing the trial record, we conclude that Terry King, through expert medical testimony, supported with substantial evidence each element of his wrongful death-medical malpractice claim against Dr. Malcolm. For example, the record contains expert medical testimony by Dr. William Wehunt, a board certified radiologist, regarding the X-rays and CAT-scan of Willard King's spine read by Dr. Malcolm at Marion County General Hospital on the morning of September 17. Dr. Wehunt testified that Dr. Malcolm breached the standard of care for a board-certified radiologist. Regarding the lateral view cervical X-ray, Dr. Wehunt testified as follows:
"[PLAINTIFF'S COUNSEL]: Do you see any abnormalities in this cervical X-ray?
"[DR. WEHUNT]: Yes, I do.

*238 ". . . .
"[PLAINTIFF'S COUNSEL]: And what abnormalities, if any, do you see?
"[DR. WEHUNT]: Well, the most obvious abnormality that I see is this line that runs, this black line that runs across the back part of the cervical spine in this region.... This is a fracture of the posterior element of C-2.
"[PLAINTIFF"S COUNSEL]: In your opinion is that a fracture?
"[DR. WEHUNT]: Yes.
". . . .
"[PLAINTIFF"S COUNSEL]: Doctor, how would you describe the fracture?

"[DR. WEHUNT]: This is an easily observed, obvious fracture of C-2.

"[PLAINTIFF"S COUNSEL]: ... Assume for me, if you will, that on or about the 17th of September 1991, that Dr. Ian Malcolm, who is a defendant in this case, looked at this particular X-ray. Assume for me, if you will, that Dr. Malcolm failed to see that fracture that you have just identified at C-2. Do you have an opinion as to whether Dr. Malcolm's failure to visualize that fracture would fall below the standard of care for [a] board-certified radiologist?
"[DR. WEHUNT]: Yes, I do.
"[PLAINTIFF'S COUNSEL]: What is your opinion?
". . . .
"[DR. WEHUNT]: It is my opinion that for a radiologist not to recognize this lucidity across that vertebral body as a fracture fails to meet the standard of care for a radiologist."
(Emphasis added.)
Regarding the "swimmer's view" X-ray, Dr. Wehunt testified:
"[PLAINTIFF"S COUNSEL]: And based on your review of this film do you see any abnormalities on that film?
"[DR. WEHUNT]: Yes, I do.
"[PLAINTIFF'S COUNSEL]: What are those, please?
"[DR. WEHUNT]: The primary abnormality present on the swimmer's view, called the fat vertebra sign, C-6 is fatter than C-7.... They gradually get bigger as you come down. One of the signs of a fracture in a vertebral body [is when] as you come down all of a sudden one gets bigger and the one below it is smaller.... The only way you can expand a bony vertebra is to break it and push it apart. For this cervical spine X-ray I am suspicious now not only of a C-2 fracture but of a C-6 fracture.

"[PLAINTIFF"S COUNSEL]: Doctor, do you have an opinion as to whether it would violate the standard of care for a board-certified radiologist to fail to see that C-6 fracture that you have just described on that exhibit?
"[DR. WEHUNT]: The failure of a board-certified radiologist to appreciate the expansion of C-6 falls below the acceptable standards of care for interpreting these films for a board-certified radiologist."
(Emphasis added.)
Regarding the CAT-scan, Dr. Wehunt testified:
"[PLAINTIFF'S COUNSEL]: Doctor, reviewing that CT-scan do you see any abnormalities in any of those slices?
"[DR. WEHUNT]: Yes.
"[PLAINTIFF'S COUNSEL]: What are those abnormalities, please? Could you point those out to the ladies and gentlemen of the jury?
"[DR. WEHUNT]: Yes. On images that are numbered 18, 19, 20 and 21 there are fractures of the body of C-6.

". . . .
"[PLAINTIFF'S COUNSEL]: Now, Doctor, do you have an opinion based upon your knowledge, experience and training as to whether it would fall below the standard of care for a board-certified radiologist... to fail to see those fractures you have just described?
"[DR. WEHUNT]: Yes, I do.
"[PLAINTIFF'S COUNSEL]: What is your opinion?
"[DR. WEHUNT]: It is my opinion that for a radiologist board-certified not to recognize the multiple fracture faults in *239 C-6 does not meet the standard of care for a radiologist.

"[PLAINTIFF'S COUNSEL]: You mentioned earlier that the X-ray [taken] at UAB shows subluxation. Do you see any evidence of subluxation on this CT-scan?

"[DR. WEHUNT]: No, sir, I do not."
(Emphasis added.)
Dr. Horace Norrell, a board-certified neurosurgeon, testified regarding the medical causation of Willard King's neurological injury:
"[PLAINTIFF'S ATTORNEY]: Did you review the Marion County Hospital record, nurse's notes, and doctor's progress reports?
"[DR. NORRELL]: Yes, sir.
"[PLAINTIFF'S ATTORNEY]: And did you review the physical therapist report?
"[DR. NORRELL]: Yes, sir.
"[PLAINTIFF'S ATTORNEY]: And in reviewing that report and that record and those documents did you form an opinion, please, sir, as to when Mr. King started or began to have neurological deficits?

"[DR. NORRELL]: Yes.

"[PLAINTIFF'S ATTORNEY]: When did that begin, please, sir?

"[DR. NORRELL]: Sometime in the afternoon of the 17th.

". . . .
"[PLAINTIFF'S ATTORNEY]: And from your professional opinion what period of time was it that this spinal cord injury was developing? Was it something abrupt or something that developed over time?

"[DR. NORRELL]: My opinion is [it] developed over time.

"[PLAINTIFF'S ATTORNEY]: And that would be from what, early evening on the 17th until when?
"[DR. NORRELL]: Well, we have it well documented by the physical therapist on the morning of the 18th.
". . . .
"[PLAINTIFF'S ATTORNEY]: Do you have an opinion, Dr. Norrell, whether if on the 16th you saw Mr. King in the condition he was in [according to] these X-rays and from your review of the hospital record, if surgery had been performed on him at that time or within a short period after that before subluxation, do you have an opinion as to whether or not it would have prevented this subsequent spinal cord injury?

"[DR. NORRELL]: Yes, sir.
"[PLAINTIFF'S ATTORNEY]: What is your opinion about that, please, sir?
"[DR. NORRELL]: My opinion is that if he were immobilized and surgery performed he would have probably more than likely been back to normal."
(Emphasis added.)
Regarding the cause of Willard King's death, Dr. Norrell testified as follows:
"[PLAINTIFF'S ATTORNEY]: Have you ever heard the term `cord stroke'?
"[DR. NORRELL]: Yes.
"[PLAINTIFF'S ATTORNEY]: Did Mr. King have a cord stroke?

"[DR. NORRELL]: No, sir.

"Q. Is there anything in the record to indicate that he had a cord stroke?
"A. No.
"[PLAINTIFF'S ATTORNEY]: Anything to indicate he had a cord stroke from the 23rd through the 30th [of September]?
"[DR. NORRELL]: No, sir.
"[PLAINTIFF'S ATTORNEY]: Anything in the record to indicate that he had a cord stroke at the time of his death?
[DR. NORRELL]: No. The autopsy didn't show it.
". . . .
"[PLAINTIFF'S ATTORNEY]: I want to show you the death certificate, which is marked Plaintiff's Exhibit 33. And do you see the, what they put on the death certificate as the cause of death?
"[DR. NORRELL]: Yes, sir.
"[PLAINTIFF'S ATTORNEY]: Do you agree or disagree with that?
[DR. NORRELL]: Quadriparesis with cardiopulmonary compromise. Yes, sir, I agree.
". . . .

*240 "[PLAINTIFF'S ATTORNEY]: And what is a pulmonary embolism?
"[DR. NORRELL]: A pulmonary embolus is when a blood clot comes from usually the legs and goes up and impedes the return of blood to the heart.
". . . .
"[PLAINTIFF'S ATTORNEY]: Dr. Norrell, did you review Mr. King's records at UAB all of the way up to the time of his death?
"[DR. NORRELL]: And after his death too.
"[PLAINTIFF'S ATTORNEY]: And do you have an opinion as to whether a pulmonary embolus was involved?
". . . .
"[DR. NORRELL]: My opinion is that he died of a pulmonary embolus. His final exit was caused by a pulmonary embolus.

"[PLAINTIFF'S ATTORNEY]: ... In Mr. King's situation do you have an opinion about what caused the pulmonary embolus?
"[DR. NORRELL]: [In] patients who have spinal cord injuries this is a common cause of death. It produces a sudden and unexpected death. It is due to the fact that when we are normal we are up walking around, the muscles milk the blood back to the heart and out of the legs. If you don't have normal muscular activity the blood sits there and pools and can actually clot inside the veins where normally flowing through the veins [sic]. These clots get larger and larger and larger and one breaks off like an iceberg and goes to the lungs and stops the blood flow.
"[PLAINTIFF'S ATTORNEY]: Do you have an opinion whether or not that's what happened to Mr. King?
"[DR. NORRELL]: I do.
"[PLAINTIFF'S ATTORNEY]: What is your opinion?
"[DR. NORRELL]: That's what happened to him."
(Emphasis added.)
Dr. Winfield Fisher, the neurosurgeon who treated Willard King at UAB, also testified that King's death was caused by a pulmonary embolism:
"[PLAINTIFF's ATTORNEY]: Do you have an opinion as to what was the cause of Mr. King's death?
"[DR. FISHER]: My opinion is not only predicated on the autopsy report and pathology report, but it's also predicated on my clinical experience and I feel the circumstances of Mr. King's death being of such an acute nature and most likely he suffered a pulmonary embolus that led to his demise.

". . . .
"[PLAINTIFF'S ATTORNEY]: ... The fact that Mr. King had some neurological deficits as a result of his neck injury that increases the risk of him sustaining pulmonary embolus; is that right?
"[DR. FISHER]: Yes, the protracted bed rest such as Mr. King had, predisposed him, if you will, to pulmonary embolus.
"[PLAINTIFF'S ATTORNEY]: If Mr. King had received prompt treatment of his cervical fractures before they caused any damage to his spinal cord, would that have eliminated the necessity of him having endured a long period of bed rest?

"[DR. FISHER]: Neurological deficits and protracted bed rest, I've already addressed that issue, predisposed the patient to pulmonary embolus."
(Emphasis added.)
In sum, we believe that Terry King presented substantial evidence of each element of the wrongful death-medical malpractice claim against Dr. Malcolm. The trial court properly denied Dr. Malcolm's motions for a directed verdict and his motion for a JNOV.

V. Motion for New Trial
Dr. Malcolm contends that the trial court erred in denying his motion for a new trial on the wrongful death-medical malpractice claim. He argues 1) that the jury's verdict was against the weight of the evidence and 2) that because the personal injury claim should not have been submitted to the jury, the evidence of Willard King's pain and suffering admitted in relation to that claim *241 prejudiced the jury as to the wrongful death claim. With respect to Dr. Malcolm's weight-of-the-evidence argument, we note that the evidence was sufficient to create a jury question on the wrongful death claim. Suffice it to say that the jury's verdict was supported by the evidence. With respect to Dr. Malcolm's second argumentthat evidence of Willard King's pain and suffering was prejudicialwe note that the trial court clearly instructed the jury that two claims were being presented for its consideration, one alleging personal injury and one alleging wrongful death, and that only punitive damages could be awarded with respect to the wrongful death claim. Given the trial court's instruction, we must assume that the jury did not use the improperly admitted evidence of pain and suffering to enhance its verdict on the wrongful death claim. See Airheart v. Green, 267 Ala. 689, 104 So.2d 687 (1958).

VI. Conclusion
For the foregoing reasons, the judgment, insofar as it pertains to the jury's verdict on the personal injury claim ($750,000), is reversed. The judgment, insofar as it pertains to the jury's verdict on the wrongful death claim, is affirmed. The case is remanded for the entry of a judgment for $250,000 ($1,000,000 less $750,000).
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, and COOK, JJ., concur.
BUTTS, J., concurs in part and dissents in part.
BUTTS, Justice (concurring in part and dissenting in part).
I concur in the majority's affirmance of the trial court's judgment in favor of Terry Grant King, as executor of the estate of J. Willard King, as to the wrongful death claim.
However, I respectfully dissent from the majority's reversal of the trial court's judgment as to the personal injury claim. I believe that, given the unique facts of this case, the personal injury claim against Dr. Malcolm should relate back, under Rule 15(c)(2), Ala.R.Civ.P., to the date of the filing of the original complaint, which was filed before Willard King's death, and, thus, that Willard King's personal-injury claim did not abate with his death. I would affirm the judgment of the trial court.
NOTES
[1] Section 6-5-462 states:

"In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tortfeasor."
[2] In King, this Court allowed a decedent's estate to pursue an action for the decedent's personal injuries, in addition to the wrongful death action, where the personal injury action was filed before the decedent's death.
[3] We are not persuaded by the plaintiff's contention that Dr. Malcolm waived this defense by not amending his answer to assert it before the trial. Dr. Malcolm raised the survival statute as a defense to the personal injury claim on the first day of the trial, and it appears that this issue was litigated with the consent of the parties. See Rule 15(b), Ala.R.Civ.P.