VISTA McDUFFIE, Plaintiff,

v.

Joseph HOPPER, et al., Defendants.

No. Civ. A. 96–A–1300–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 23, 1997.

William Monroe Dawson, Jr., Gayle H. Gear, Dawson & Gear, Birmingham, AL, for plaintiff.

Bobby Neal Bright, C. Joseph Norton, McInnish, Bright & Long, PC, Montgomery, AL, for defendants.

### *MEMORANDUM OPINION & ORDER*

ALBRITTON, District Judge.

This cause is before the court on the Motion for Summary Judgment filed on August 7, 1997, by defendants: Correctional Medical Services, Inc. ("CMS"), Dr. Gail Williams, Dr. William Sanders, and Dr. Charles Woodley.

Vista McDuffie ("McDuffie") filed this action on August 20, 1996. In his Complaint and amendment thereof McDuffie named six defendants: Joseph Hopper, individually and officially as Commissioner of the Alabama Department of Corrections ("DOC"); Merle Friesen, individually and officially as Di-

rector of Treatment of the DOC; CMS; Dr. Williams, individually and officially as CMS's Chief Psychiatrist and Mental Health Director; Dr. Woodley, individually and officially as CMS's Director of Psychological Services at Kilby Correctional Facility; and Dr. Sanders, individually and officially as a CMS psychiatrist at Kilby. Individual claims against Hopper were released by order of the court on March 25, 1997; claims against Friesen were dismissed on July 24, 1997.

McDuffie filed suit as the personal representative of his deceased father Billy Roberts, Sr., a prisoner who committed suicide while in the custody of the DOC, and under the care of CMS. In the Complaint, McDuffie asserted the following claims: cruel and unusual punishment under 42 U.S.C. § 1983 ("§ 1983"), in violation of the Eighth Amendment to the United States Constitution; wrongful death caused by negligence, indifference and/or recklessness, in violation of Ala.Code 1975, § 6–5–410; and malpractice, in violation of Ala.Code 1975, § 6–5–484. The court has jurisdiction over the § 1983 claim based on a federal question. *See* 28 U.S.C. § 1331. The court also has jurisdiction over the state law claims based on supplemental jurisdiction. *See* 28 U.S.C. § 1367.

Defendants CMS, Williams, Woodley, and Sanders ("Medical Defendants") have made four arguments in their renewed motion for summary judgment. Their previous motion was denied. The four arguments in the present motion are: (1) that Medical Defendants are entitled to qualified immunity; (2) that Plaintiff has not come forward with sufficient evidence of deliberate indifference; (3) that Plaintiffs claims are barred by res judicata; and (4) that Plaintiffs state law claims abated at Plaintiffs death. For the reasons discussed herein, the present motion for summary judgment is due to be GRANTED in part and DENIED in part.

### I. *SUMMARY JUDGMENT STANDARD*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. at 2552–53.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); see also Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response . . . must set forth specific facts showing that there is a genuine issue for trial.").

What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment.

*Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989).

The evidence presented by the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

## II. *FACTS & CONTENTIONS*

When viewed in the light most favorable to the non-movant, submissions before the court establish the following facts. Several contentions are also discussed. The court has not sought out evidence on all contentions of the parties because of the voluminous nature of the submissions, the limited nature of the present summary judgment motion, and the court's requirement that the parties specifically point out relevant evidence by page and line number. These contentions or allegations are noted as such.

McDuffie is an Alabama resident and the administrator of the estate of Billy Roberts, Sr. CMS is a Missouri corporation which contracts with the State of Alabama to provide mental care to the state's prisoners. CMS employs the three persons who are also movants here. Williams is the statewide mental health director for CMS, a position which the Plaintiff asserts is a policy-making position. Sanders is a psychiatrist employed by CMS; and Woodley is employed by CMS as a psychologist / director of acute mental health care at Kilby prison.

Roberts was an inmate in the custody of the Alabama DOC from 1978 until his death

in 1995. Among the facilities housing Roberts was Kilby, a DOC prison. Records indicate that during the seventeen years of his imprisonment, Roberts suffered severe and recurrent psychiatric illness. On many occasions while at Kilby, Roberts informed medical staff that he was hallucinating, hearing voices, and thinking about suicide or other self injury. He sometimes requested medication and physical restraint because of his conditions, and was often put on suicide watch. At least four times, Roberts unsuccessfully tried to commit suicide. In particular, in December 1990 Roberts attempted to commit suicide by hanging himself in his P–I unit cell, a type of isolation cell. In December 1993, Roberts again attempted to commit suicide by taking an overdose of Thorazine while at Kilby.

During June of 1995, Roberts had been transferred to St. Clair Correctional Facility, but was eventually sent back to a P–I cell at Kilby. Roberts was housed in one of these cells until his death. Plaintiff presents evidence that the confinement in this type of cell, as opposed to a psychiatric hospital or a unit where more psychiatric care could be given, amounted to deliberate indifference. Plaintiff also presents evidence that CMS, through Williams, had a policy or practice of eliminating transfers to the state psychiatric hospital, and underusing psychiatric care units (so-called "MHU's" or mental health units).

During many of his years in prison and most of the month prior to his suicide, Roberts was receiving large doses of a psychotropic drug. As of September 5, 1995, Roberts was being medicated with 200 milligrams of Thorazine [1] in the morning and 1,000 milligrams of Thorazine at bedtime. He was also taking 150 milligrams of Tofranil at bedtime. These medications apparently did not greatly reduce Williams' suicidal thoughts. On September 14, 1995, Roberts requested that all personal items be removed from his cell because his hallucinations were intensifying. He also made statements to prison personnel about suicide or self-harm on September 7 and 18.

Despite these reports of suicidal thoughts by Roberts, a decision was made to discontinue his psychotropic medication. Williams allegedly gave the instructions, or at least made strong suggestions, to discontinue the medication. Plaintiffs allege that this was part of a policy of CMS that was instituted by Williams, a policy to get as many prisoners off of psychotropic drugs as possible in order to cut costs. On September 19, 1995, Sanders and Woodley went to Roberts' cell and informed him that they were ending his daily dosages of Thorazine. On the same day, Roberts told Woodley he was hearing voices and having suicidal thoughts. On September 19, 1995, Roberts asked a nurse at Kilby to remove his mattress, because his hallucinations were telling him to tear his mattress apart and hang himself.

There is also evidence that Roberts was not properly treated after the discontinuation of the medicine, and was not in a proper situation for treatment. Roberts apparently complained about the discontinuation of the medicine, but was not appropriately visited by the Medical Defendants. Also, Roberts was not transferred from the isolation cell. On September 24, 1995, Roberts committed suicide at Kilby by hanging himself with a bedsheet tied to the bars of his isolation cell.

Plaintiff alleges that CMS hired a dangerous director, Williams, who instituted dangerous policies with regard to drug stoppage and placement of inmates. Plaintiff alleges that Sanders signed the order ending the Thorazine, failed to review Roberts' history, and failed to screen Roberts for suicide at appropriate times. It is also contended that Sanders did not order any precautions or alternate therapy for Williams after cessation of the Thorazine.[2] Woodley is alleged to have furnished the bedsheet or allowed Roberts to have the bedsheet, and to have failed to take proper precautions to prevent the suicide.

---

**1.** Thorazine is an extremely potent anti-psychotic drug.

**2.** Sanders purports to be an independent contractor, but Plaintiff says that Williams controls his work. This issue is not a subject of the motion for summary judgment.

## III. *DISCUSSION*

### A. QUALIFIED IMMUNITY

▮ Defendants argue that they are entitled to qualified immunity. Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. *Ansley v. Heinrich,* 925 F.2d 1339, 1345 (11th Cir.1991). An official is entitled to qualified immunity if he is performing discretionary functions and his actions do " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1424 (11th Cir.1997). Under this standard, a government agent is entitled to such immunity unless his "act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing...." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

▮ Prior to analyzing whether the Medical Defendants were acting within their discretion or violating clearly established law, the court must address the threshold question whether these particular defendants are entitled to claim the benefits of qualified immunity under § 1983 at all. Not all defendants who may be sued under § 1983 are entitled to even claim such immunity. In 1992, the Supreme Court decided that private defendants who are subject to § 1983 liability for invoking state attachment, garnishment, and replevin statutes are not entitled to claim a qualified immunity defense. *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). This decision directly overruled an earlier decision by the Eleventh Circuit. *See Jones v. Preuit & Mauldin,* 851 F.2d 1321, 1323–24 (11th Cir.1988) (en banc), vacated on other grounds, 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989). The question raised here is whether the present Medical Defendants, who are not government entities or government employees, are themselves eligible for qualified immunity. This court decides that they are not.

Following *Wyatt,* the Eleventh Circuit expanded the class of private persons who are not entitled to claim qualified immunity. In *Burrell v. Bd. of Trustees of Ga. Mil. Coll.,* 970 F.2d 785, 796 (11th Cir.1992), the court held that defendants who "are alleged to have acted in concert with public officials for the sole purpose of depriving another of her constitutional rights ... cannot claim the protection of qualified immunity." The Eleventh Circuit left open the question, however, whether qualified immunity would be available in cases where the private defendants were being sued for not "fulfill[ing]" their duties under a government contract," or are being sued for "assum[ing] under court order the responsibilities of a public official." *Id.* Specifically, in *Burrell* the Eleventh Circuit distinguished decisions such as *Rodriques v. Furtado,* 950 F.2d 805 (1st Cir.1991), which had held that a doctor performing under a court order was entitled to qualified immunity.

The Eleventh Circuit thereby established what another circuit has come to call the *"Burrell* dichotomy." *Warner v. Grand County,* 57 F.3d 962, 967 (10th Cir.1995). The dichotomy differentiates between private party § 1983 defendants such as those in the *Wyatt* case, ones who are acting for private ends and cannot claim qualified immunity, and private party § 1983 defendants who "perform[ ] a government function pursuant to a state order or request" and who are "entitled to qualified immunity." *Id.* (holding that defendant who performed strip search at request of government official was entitled to qualified immunity); *see also Sherman v. Four County Counseling Ctr.,* 987 F.2d 397 (7th Cir.1993) (distinguishing *Wyatt* denial of immunity from case where party contracted with government; granting immunity to latter).

The *Burrell* dichotomy does not control the present case, however. The validity of that reasoning and rationale has been called into question by a recent Supreme Court decision. Just this summer the Supreme Court revisited the issue of qualified immunity for private parties sued under § 1983. In *Richardson v. McKnight,* —— U.S. ——, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), the defendants were prison guards employed by a private company hired to manage a Tennes-

see prison. *Id.* at ——, 117 S.Ct. at 2102. The Supreme Court held that these private party § 1983 defendants were not entitled to raise the defense of qualified immunity.

The Supreme Court's analysis focused on both history and policy. As to history, the Supreme Court's found "no evidence that the law gave purely private companies or their employees any special immunity from such suits." The Court held that this absence of a history of immunity was reason not to grant immunity to the private prison guards, especially in the face of a history of privately run correctional institutions. *Id.* at ——, 117 S.Ct. at 2104. The Court pointed out that "the law *did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Id.* at ——, 117 S.Ct. at 2105 (emphasis in opinion). Nevertheless, the Court found "no indication of any more general immunity that might have applied to private individuals working for profit." *Id.*

As a matter of policy, the Court analyzed qualified immunity as a doctrine designed to protect public *officials*. *Id.* at ——, 117 S.Ct. at 2105–06 (emphasis added). The "mere performance of a governmental function" by a private defendant could not, alone, entitle that defendant to claim qualified immunity. *Id.* at ——, 117 S.Ct. at 2106. The real worry addressed by qualified immunity is that public officials, who have the protection of civil service and are not subject to strict oversight and management, may be stricken with "unwarranted timidity" in the face of liability. *Id.* Private companies and their employees, as the majority saw it, have other incentives to zealously perform their duties. *Id.* If private companies or their employees fail in their duties, they may be replaced. *Id.* This can occur either through the process of state review or because of "marketplace pressures." *Id.* at ——, 117 S.Ct. at 2106. The majority reasoned that private employees are less susceptible to the problems which lawsuits pose for public employees, because the private employees may be insured by their employer and can be compensated for the risks that they take. *Id.* at ——, 117 S.Ct. at 2107. Consequently, government contractors, already subject to "competitive pressures that normally help private firms adjust their behavior in response to the incentives that tort suits provide," deserve no qualified immunity. *Id.* at ——, 117 S.Ct. at 2108.

As the Defendants point out, the Supreme Court's decision in *Richardson* is meant, by its own terms, to be interpreted "narrowly." *Id.* The Court's opinion even closes with three caveats. These note that the decision was limited to the facts before it; the decision did not address whether the defendants acted under color of state law; and the decision did not address whether the defendants were entitled to some sort of good faith defense, even if they were not entitled to immunity. *Id.* at ——, 117 S.Ct. at 2108.[3]

To no avail, the Defendants argue that *Richardson*'s narrow holding leaves the door open for this court to distinguish the present Defendants, private party health care provid-

---

**3.** There is a strong, four Justice dissent in *Richardson*. Justice Scalia wrote the dissent, and was joined by the Chief Justice, and Justices Kennedy and Thomas. Justice Scalia agreed with almost none of the majority's analysis, except that he too focused on history and policy, coming to the conclusion that the majority's holding was inconsistent with both. *Richardson*, —— U.S. at —— ——, 117 S.Ct. at 2108–09. Justice Scalia's opinion criticizes the majority's private/public distinction, and would focus on the function performed by the defendant in deciding whether the defendant is entitled to immunity. *Id.* at —— ——, 117 S.Ct. at 2109–10. Justice Scalia noted that, as a historical matter, several private parties, such as jurors and witnesses, received important immunities. *Id.* at ——, 117 S.Ct. at 2110. He also strongly questioned the Court's economic/policy analysis. He thought that a discussion of "market pressures" in the area of prison management was a farce. *Id.* The state, in his opinion, actually has little incentive to manage the prisons, except for costs; and the private employees are subject to some of the same bad incentives (or disincentives) as public employees (i.e. costs can be reduced through timidity) *Id.* at ——, 117 S.Ct. at 2111. Justice Scalia also questioned the majority's reliance on the presence of insurance and civil service laws for its decision. *Id.* at ——, 117 S.Ct. at 2112. He concluded with a strong questioning of the public/private distinction made by the majority, noting that guards paid by the state, and guards paid by an independent contractor are "indistinguishable in the ultimate source of their authority, ... indistinguishable in the powers that they possess, ... and ... indistinguishable in the duties that they owe." *Id.* at ——, 117 S.Ct. at 2112.

ers, from private party guard defendants, for purposes of § 1983 immunity. The caveats are not as narrow as the Defendants assert, however. *Richardson* only limits itself to the context

> in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms.

*Richardson,* —— U.S. at ——, 117 S.Ct. at 2108.

Defendants are well within *Richardson*'s reach. Indeed, CMS took on the management of the medical services for all of the prisoners in the Alabama system. Also, the Defendants have not shown that CMS was strictly supervised by the State, or that CMS did not bid on this contract in order to achieve a profit. Finally, Defendants have not shown the court that CMS or its employees were merely

> briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision.

CMS and its employees fall precisely within the parameters of *Richardson.*

Defendants only cite the court to one case for the proposition that *Richardson* should not apply. That case, *Howell v. Evans,* 922 F.2d 712 (11th Cir.1991)[4] reversed a trial court which had held that a defendant employed by CMS was not entitled to qualified immunity. *Id.* at 722. The Defendants cite

this opinion for the proposition that immunity has historically been granted to doctors performing in situations similar to CMS. Defendants apparently are trying to come within the statement made by the Supreme Court that immunity has traditionally been accorded to doctors who perform "at the behest of the sovereign." Defendants' reliance on this 'exception' is misplaced, however. CMS is not performing at the "behest of the sovereign," as this court interprets that language. CMS is a government contractor, performing for the same reasons as the government contractor in *Richardson.*

The Supreme Court's reference to doctors performing at "the behest of the sovereign" more accurately refers to situations such as that in *Rodriques,* referenced above. There, the doctor was performing pursuant to a court order. Here, CMS is not performing subject to requirements of a court order. Rather, CMS is performing at its own behest, performing at the behest of its desire to acquire accounts and profit.[5]

Defendant's reliance on *Howell* is also misplaced. *Howell* does not address any historical tradition of immunity for doctors. *Howell* only decides that a certain set of private party doctor defendants should be entitled to immunity as they did not violate clearly established law; it does not discuss at all the issue of whether private party defendants should be able to claim qualified immunity. in the first place.[6]

 It would strike this court as strange to find that private contractor doctors can claim the protections of qualified

---

4. This opinion has a strange history. It was vacated because of a settlement. *Howell v. Evans,* 931 F.2d 711 (11th Cir.1991). Later, however, it was reinstated, but without a published opinion. The reinstatement is recognized in an appeal after remand. *Howell v. Burden,* 12 F.3d 190 (11th Cir.1994). The persuasiveness of the opinion on which the Defendants rely is, of course, undercut by the fact that it was written prior to prior to the Supreme Court's holding in *Richardson.* Indeed, it was also written prior to the Supreme Court's holding in *Wyatt,* as well as prior to the Eleventh Circuit's statements in *Burrell.* It was at least implicitly affirmed after these, however, by the 1994 opinion, in *Howell v. Burden.*

5. The court is not saying that there is anything wrong with free enterprise or the profit motive,

only distinguishing CMS's place from that of the doctor in *Rodriques.*

6. To argue that *Richardson* is too narrow to encompass the present situation, is to argue (at least implicitly) that some other source of law applies. This court rests its decision on a finding that *Richardson* does not apply to these facts. Even if this court had decided that *Richardson* did not directly apply, however, the reasoning of *Richardson* would lead the court to the same conclusion. If *Richardson* had left the door open, so to speak, there would be no Eleventh Circuit decision which would compel this court to hold that the Medical Defendants are entitled to claim qualified immunity.

Defendants cite the court to *Howell v. Evans,* 922 F.2d 712 (11th Cir.1991), discussed above, for the proposition that immunity has historically

immunity, while private contractor guards cannot. Fairness dictates that like-situated persons be treated alike. *Richardson* makes it clear that the function that a private party serves is not determinative of whether they are entitled to qualified immunity. *Richardson* further makes clear that those who contract to engage in government services without supervision, and for profit in a competitive marketplace. subject themselves to liability under § 1983 without the protections of immunity. CMS and its employees are within *Richardson*'s holding. They are, therefore, not entitled to claim the protections of qualified immunity.[7] Summary judgment on this claim is due to be DENIED.

## B. SUFFICIENCY OF THE EVIDENCE/DELIBERATE INDIFFERENCE

■ Defendants also challenge the sufficiency of the Plaintiff's evidence of deliberate

---

been granted to doctors performing in a situation similar to CMS. In *Howell*, the Eleventh Circuit grants immunity to private party doctor defendants sued under § 1983. The opinion does so by jumping directly to a discussion of whether the doctor had violated clearly established law, *Id.* at 721, assuming, without deciding, that qualified immunity necessarily follows § 1983 liability. This may not be surprising given that the Supreme Court had not yet decided *Wyatt or Richardson*, at the time that the Eleventh Circuit decided *Howell*. The persuasiveness of citing *Howell* in support of the Defendants' position in this case is undercut by the lack of analysis in *Howell*, and the Supreme Court's subsequent analysis in *Wyatt* and *Richardson*. Furthermore, *Howell*'s implicit holding probably follows the Eleventh Circuit's overruled analysis in *Jones v. Preuit & Mauldin*, supra, which *Wyatt* specifically overruled.

Eleventh Circuit cases which have followed *Wyatt* have done nothing to clarify this issue. *Adams v. Poag*, 61 F.3d 1537, 1542 (11th Cir. 1995) holds that certain employees of CMS were entitled to qualified immunity. Again, however, the court does so by jumping straight to an analysis of clearly established law; it does not address the question whether private party doctors are entitled to claim qualified immunity at all. It may well be that this question was not raised by the parties. The Eleventh Circuit did point out in a footnote that CMS doctors "are not public employees in the strict sense of the term." *Id.* at 1542 n. 2. Nevertheless, where such parties performed a "function that traditionally falls within the exclusive purview of a state entity ... state action is present." *Id. Adams* assumes, it appears, that the application of qualified immunity necessarily follows the application of § 1983, at least in cases where the defendant performs a traditional state function. Whatever analysis *Adams* contains, therefore, is apparently based on the now-disfavored *Burrell* dichotomy.

*Dolihite v. Maughon By and Through Videon*, 74 F.3d 1027 (11th Cir.1996), cert. den. ⸺ U.S. ⸺, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996), involved a suicide committed by a juvenile who was civilly confined in an Alabama institution. There, the panel decided, inter alia, that two doctors in a company's employ were entitled to summary judgment on the grounds of qualified immunity. *Id.* at 1049, 1051. The opinion

jumps directly to a discussion of whether the doctors violated clearly established law. It assumes that the defendants are entitled to raise the defense of qualified immunity "[b]ecause they are individuals subject to liability under § 1983." *Id.* at 1044-45. This assumption was wrong. Both the Supreme Court in *Wyatt* and the Eleventh Circuit in *Burrell* had decided by this time that private parties sued under § 1983 were not entitled to raise the defense of qualified immunity merely because they were subject to § 1983 liability.

It appears, therefore, than the issue of whether private party § 1983 defendants, such as those here, can claim qualified immunity has never been raised, or at least has never been fully addressed, by the Eleventh Circuit. The question was unanswered until *Richardson*.

7. Plaintiff also makes an additional argument for denying qualified immunity to CMS. That argument analogizes the position of CMS to that of a municipality. When municipal corporations are sued under § 1983, a plaintiff must prove that the violation occurred because of the municipality's official policy or custom. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir.1997), discussing *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The municipality is not entitled to claim qualified immunity. *Heggs v. Grant*, 73 F.3d 317, 319 n. 5 (11th Cir.1996). Here, McDuffie is asserting that because companies are treated like municipalities for the purposes of § 1983 liability, companies should also be treated like municipalities for the purposes of qualified immunity. Plaintiff is not able to cite to any case for the proposition that a company should be treated like a city for purposes of qualified immunity.

The court does not have to decide whether private companies should be treated like municipalities for the purposes of qualified immunity. A distinction between CMS and the doctors in its employ, for purposes of qualified immunity, will make no difference here. If CMS is treated like an individual, it is not entitled to qualified immunity based on the analysis stated above. If it is treated like a municipality, it would also not be eligible to claim the protection of qualified immunity.

indifference. This court decided once before that the Plaintiff had submitted evidence sufficient to raise a question of fact for the jury on this issue. Now, Defendants have resubmitted this issue to the court, relying almost exclusively on the Plaintiff's experts' testimony to make their arguments for summary judgment. Because this court has already thoroughly reviewed the evidence in this case on one occasion, and come to the conclusion that summary judgment should be denied, this additional motion by the Defendants will only be considered to the limited extent that it challenges the testimony of the Plaintiff's experts.

 The legal standard at issue is relatively settled. It is a violation of a prisoner's constitutional rights to be *deliberately indifferent* to the prisoner's *serious medical needs. Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986) (emphasis added). Deliberate indifference involves something more than negligence, but something less than a desire to intentionally harm; in effect, an official is deliberately indifferent when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he ... [actually] draw[s] th[at] inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). Deliberate indifference may be shown when a doctor takes the "easier and less efficacious route in treating an inmate" or when medical care is delayed or denied. *Rogers,* 792 F.2d at 1058. In

addition, medical care that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment." *Id.*[8]

The Eleventh Circuit recently addressed a case similar to the instant one. *Steele v. Shah,* 87 F.3d 1266 (11th Cir.1996), reversed a grant of summary judgment to a doctor who had discontinued a prisoner's psychotropic medicine. *Steele* involved a prisoner who was considered a suicide risk and had been issued psychotropic medications. *Id.* at 1267. Upon being transferred to a new facility, a new doctor suspended the prisoner's psychotropic medicines without review of his file, and without setting a new treatment plan. *Id.* The new doctor continued in this manner even though the old facility warned him of the prisoner's condition and even though the prisoner and the doctor were not able to have a true meeting to discuss the change. *Id.* at 1268. The prisoner eventually filed suit after he left this second facility.

*Steele* turned on whether the plaintiff presented sufficient evidence of deliberate indifference. *Id.* at 1269. The court noted that "psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference." *Id.* at 1269, citing to *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990).[9] Specifically, the court in

---

**8.** To hold CMS liable for deliberate indifference requires a finding of causation which is not applicable to the individual defendants. In order to place § 1983 liability on an institutional defendant, a plaintiff must show an affirmative causal connection between the alleged constitutional violation and an official policy or custom of the institutional defendant. *Buckner v. Toro,* 116 F.3d 450, 452 (11th Cir.1997), discussing *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Eleventh Circuit has specifically rejected the application of respondeat superior liability in cases where "private entities [are] acting in the place of" a governmental entity. *Buckner,* 116 F.3d at 452, citing *Howell v. Evans,* 922 F.2d 712, 724 (11th Cir.1991), vacated pursuant to settlement, 931 F.2d 711 (11th Cir.1991), reinstated by unpublished order (June 24, 1991), cited in *Howell v. Burden,* 12 F.3d 190, 191 n. * (11th Cir.1994) (explaining procedural history). Private companies which "provide medical services to inmates

... become[] the functional equivalent" of the governmental entity. *Buckner,* 116 F.3d at 452. They are, therefore, entitled to the requirement that liability only be found where there is an official policy or custom. This requirement is not a type of immunity, but is "an element of a § 1983 claim." *Id.* at 453. It should not, therefore, vary with the state function that the private entity is substituting. Although it is not at issue at this time, Plaintiff has made allegations that Williams is a policymaker for CMS, and engaged in dangerous policies regarding drug stoppage and placement of inmates. Plaintiff also alleged that CMS engaged in a dangerous practice by hiring Williams.

**9.** The court noted that *Greason* had not been adversely affected by the Supreme Court's holding in *Farmer v. Brennan. See Steele,* 87 F.3d at 1269 n. 2.

*Steele* noted that at least since 1990 there had been a "clearly established right to have [one's] psychotropic medication continued if discontinuation would amount to grossly inadequate psychiatric care." *Steele*, 87 F.3d at 1269. *Steele* reversed summary judgment granted to the doctor, in part because there was evidence presented that the discontinuance of the psychotropic medication was done after only "one cursory interview and without having reviewed any medical records beyond" a short list of medicines sent from the first facility. *Id.* at 1270. The doctor's decisions were also made in the face of evidence that Steele had been determined to be a suicide risk. *Id.*

The Eleventh Circuit has also established the meaning of "deliberate indifference" in the context of a suicidal inmate. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason*, 891 F.2d at 856–37 (denying qualified immunity to mental health official who knew of suicide threats and did not monitor prisoner). "There can be no deliberate indifference to an inmate's safety, however, unless there was a 'strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction.'" *Heggs v. Grant*, 73 F.3d 317, 320 (11th Cir.1996) (granting qualified immunity to jail official where prisoner was well-known not to be dangerous to herself, and quickly recanted a threat to kill herself), quoting *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir.1994) (en banc).

Defendants' reliance on the Plaintiff's experts' testimony is an unusual strategy. It is not unusual merely because it relies on expert testimony. Indeed, expert testimony in a case such as this is helpful to the court. The Eleventh Circuit has recognized that it will help enlighten the court as to "specific deficiencies in a [medical] treatment and specific medically accepted standards." *See Dolihite*, 74 F.3d at 1046 (discussing usefulness of expert testimony in determination of whether qualified immunity is appropriate

for a medical care provider in a deliberate indifference case). Rather, Defendant's reliance on this expert testimony is odd because the two experts so clearly state evidence of a violation of Robert's constitutional rights.

The first expert, Seymour Halleck, M.D., is a professor of psychiatry and law at the University of North Carolina. *Halleck Affid.* Halleck's testimony describes a course of treatment for Roberts that qualifies as deliberately indifferent to serious medical needs. Halleck testifies that Roberts was on an "exceptionally high dose" of Thorazine at the time his medication was abruptly stopped. *Id.* at 6. The expert terms it a "serious departure from contemporary standards of psychiatric care" to terminate such a large dose of medication without considering alternatives. *Id.* Halleck also states that it was "derelict" not to contact doctors who had previously treated Roberts before ending the medicine. *Id.* at 9. Halleck also testifies that Sanders' knowledge of Roberts was inadequate to make the decision to terminate Roberts' medication. *Id.* at 9. This alone was "grossly contrary to accepted medical practices." *Id.* at 11.

Halleck believes that the defendant doctors were engaging in a "risky experiment" and doing so without suicide precautions which were advised given Roberts' history. *Id.* at 6. The records indicate that Dr. Sanders, who regularly visits on Thursdays, did not see Roberts on Thursday the 21st, two days after the medicine was stopped. *Id.* at 7. Woodley's "[f]ailure to institute suicide precautions, in light of known circumstances, [wa]s a gross departure," likewise. *Id.* at 12.

Halleck also describes a treatment environment which was woefully inadequate to the task. The type of cell in which Roberts was housed actually "increase[d] the depth and severity of an inmate's mental illness" and subjected patients, especially patients like Roberts, to "grossly inadequate" conditions. *Id.* at 7. Furthermore, there was no evidence that Roberts was going to receive better treatment to help with the adjustment off of the medication. There were no notes or orders indicating when Roberts might be transferred to the Mental Health Unit at Kilby. *Id.* at 7–8. As the testimony makes

clear, this is no mere difference in professional judgment over whether the treatment environment was appropriate; "[s]olitary confinement is not treatment" at all. *Id.* at 13.

Halleck also makes it clear that these actions were not the result of mere negligence or malpractice Halleck testifies that CMS had a policy of reducing medication and treatment without a "clear rationale" for doing so. *Id.* at 9. Further, CMS did so "without a system for monitoring [the] impact" of its cessation of medicine. *Id.* at 9. This policy was also fully enforced by Williams, who made it a "policy to fire any psychiatrists who resisted [his] professed goal to significantly reduce psychotropic medication." *Id.* at 9. Williams paid too little attention to the needs of patients, in such a manner as to "serious[ly] depart[ ] from the standard of care." *Id.* at 11. Halleck's testimony supports a claim of deliberate indifference.

Plaintiff's other expert is Stanley L. Brodsky, a Professor of Psychology at the University of Alabama. *Brodsky Affid.* at 1. Brodsky also paints a picture of deliberate indifference to the decedent's serious medical needs, noting that the Medical Defendants even failed to follow their own regulations regarding suicide precautions in Roberts' case. *Id.* at 2–3. Brodsky states that some actions engaged in by the Defendants constituted negligence in practice, but some were "intentional" ignorings of standards. *Id.* at 12.

One alleged reason that the Defendants took Roberts off of his medication was that Roberts was actually faking his symptoms. Brodsky says that this diagnosis was "markedly erroneous," when viewed in light of Roberts' history. *Id.* at 10. Brodsky states that a review of Roberts' records reveals that Thorazine had actually helped reduce Roberts' symptoms. *Id.* at 14. Brodsky also complains about the ceasing of transfers to Taylor Hardin, a secure mental hospital. *Id.* at 15. Brodsky states that Roberts was housed in a unit (P–1) which did not treat patients at all, but merely housed them. *Id.* at 13.

Brodsky has written numerous pieces on the ethical struggles of prison psychiatrists and believes that Williams inappropriately brings punishment factors into his treatment. *Id.* at 11–12. Brodsky also lays blame on the other Medical Defendants, as well. He testifies that Woodley was aware of Roberts' suicidal thoughts, but followed through with the discontinuation of medicine, and neglected to take other treatment. *Id.* at 12. Brodsky testifies that Sanders knew little about Roberts at all, either his suicide attempts or other history. *Id.* at 12–13.

Defendants ignore this overwhelming amount of testimony from the Plaintiff's experts which supports a deliberate indifference claim. Instead, Defendants focus narrowly on a few specific statements hoping to show that these statements constitute some sort of bomb which dislodges Plaintiff's case. These statements are in many ways taken out of context, however, and in any case, do not state a legal reason to grant summary judgment. There are six such passages of testimony quoted by the Defendants.

First, the Defendants quote a statement by Brodsky that decedent had been placed on suicide watch 50 to 100 times. *Brodsky Depo.* at 109:16–110:3. This statement, of course, does not settle, indeed does not even relate to, whether the particular defendants were deliberately indifferent at the time of Roberts' death. Whether Roberts was placed on suicide watch in the past is not determinative of whether the present Defendants were acting with deliberate indifference at the time of the suicide. It may be persuasive to a fact-finder, but it does not eliminate the need for a fact-finder.

Second, Defendants cite to a portion of testimony by Brodsky in which Brodsky states that it is a professional judgment to decide when to take a person off of suicide watch. *Brodsky Depo.* 110:13–111:10. Of course, the fact that this can be a professional decision in general, does not settle whether Defendants were exercising professional judgment at the time that Roberts died.

Third, Defendants cite to a portion of Brodsky's testimony indicating that Dr. Woodley may have met with the decedent before taking him off of suicide watch two on

September 22. *Brodsky Depo.* at 111:11–15. In this portion of testimony, Brodsky also notes that Woodley had observed some factors which may indicate it was appropriate to take the decedent off of suicide watch. *Brodsky Depo.* at 137:16–139:23. These statements ignore the overall impression of Brodsky, however, that decedent was improperly treated after the medication was stopped. By raising evidence of one visit, Defendants have not shown that there is no matter in factual dispute, rather they have only shown that there is a dispute.

Fourth, Defendants point out that Dr. Halleck testified that he did not believe that any doctor intentionally tried to harm the decedent, but only thought that the treatment was reckless. *Halleck Depo.* at 64:4–23. To argue that this statement necessitates summary judgment is to ignore the appropriate legal standard. As noted above, deliberate indifference does not require evidence of an intention to harm.

Fifth, Defendants note that Halleck testified that Sanders did not intentionally "want[ ] to hurt Billy Roberts." *Id.* For the reasons just stated, this fails to compel summary judgment.

Finally, Defendants cite to a portion of testimony by Halleck in which he stated that Dr. Williams shifted the focus of Roberts' treatment "from psychosis and depression to factitious disorder and malingering." *Id.* at 76:5–11. Defendants are apparently trying to show that there merely exists a medical difference of opinion between Halleck and Williams. This ignores Halleck's other testimony, however, that this shift in focus was motivated by deliberate indifference to Roberts' serious medical needs. Defendants have simply shown no testimony of the Plaintiff's experts which compels summary judgment.[10] Therefore, judgment at this stage on this claim is due to be DENIED.

**C. RES JUDICATA / COLLATERAL ESTOPPEL**

Defendants have also argued for summary judgment on the grounds of res judicata. This argument is based on the fact that there is another on-going lawsuit contesting the conditions of mental health services within the Alabama Department of Corrections. *Bradley v. Harrelson,* CV–92–A–70–N (M.D.Ala.). Defendants assert that Plaintiff "should not be allowed to relitigate the constitutional conditions, as a whole of the Mental Health ward" at the prison where plaintiff was treated. *Defendant's Renewed Motion for Summary Judgment at 16.*

A federal court applies federal law when it determines the preclusive effect of a previous federal court decision. *Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1501 (11th Cir.1990). Here, the applicable federal law is that of the Supreme Court and Eleventh Circuit. The Eleventh Circuit has held that claim preclusion "bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Id.* Specifically, claim preclusion (res judicata) applies when the first decision was " '(1) . . . a final judgment on the merits, (2) . . . rendered by a court of competent jurisdiction' "; and the first suit involved (3) identical parties, or their privies, " 'and (4) the same cause of action.' " *Id.* (citation omitted). Here, claim preclusion cannot apply for an obvious reason: the first suit, *Bradley,* is not final; it is pending on a Recommendation of a Magistrate Judge. In addition, Defendants have failed to show that the two suits involve identical causes of action. *Bradley* is a class action filed for injunctive relief, the present suit involves one plaintiff suing for a particular violation of constitutional rights. "It is clear that a prisoner's claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member

---

**10.** Defendants also submit new affidavits from Drs. Woodley and Sanders characterizing the treatment and the reasons for the treatment of Roberts. These affidavits serve merely to show that there are disputes between those doctors and the experts as to whether the treatment was

deliberately indifferent or not. As noted earlier, this court thoroughly reviewed the documentary evidence surrounding the suicide as well as several depositions when the previous motion for summary judgment was denied. Plaintiff has presented a case to survive summary judgment.

of a pending class action." *Fortner v. Thomas,* 983 F.2d 1024, 1031 (11th Cir.1993).

Collateral estoppel does not eliminate entire claims, but only works to prevent relitigation of certain issues. It applies when there is a factual or legal decision at issue and that decision is (1) "identical" to an issue, (2) which was "actually," and (3) "necessar[ily]" decided in a previous proceeding. *Id.* at 1501 n. 6. Furthermore, the prior determination must have been (4) counter to the interests of a present "party against whom the earlier decision is asserted" (5) and must have been reached after that party had a "full and fair opportunity to litigate the issue" *Id.* Again, there have been no determinations in *Bradley* of which Defendant can claim a benefit; *Bradley* is not a final decision. Further, Defendant has not shown which determinations were identical and actually and necessarily made, nor have Defendants shown that *Bradley* involved identical issues, which the present Plaintiff had a "full and fair opportunity to litigate."

Defendants' motion for summary judgment on the basis of res judicata and/or collateral estoppel is due to be DENIED.

## D. ABATEMENT OF STATE LAW CLAIMS

Defendant argues that Plaintiff's claims should abate because they were not filed prior to the Plaintiff's death. Defendant bases this claim on Ala.Code, 1975, § 6–5–462, which states in material part, "all claims upon which an action *has been filed* ... survive in favor of ... personal representatives" (emphasis by this court). This statute is also read as a negative. The Alabama Supreme Court has held that, under the statute, "an unfiled tort claim does not survive the death of the person with the claim." *Malcolm v. King,* 686 So.2d 231 (Ala.1996). As is demanded by logic, the statute has been held not to abate actions for wrongful death. *Mattison v. Kirk,* 497 So.2d 120 (Ala.1986), overruled on other grounds, *King v. National Spa & Pool Inst., Inc.,* 607 So.2d 1241 (Ala.1992).

Plaintiff has not cited the court to any case law which suggests that medical malpractice claims for personal injuries survive when the plaintiff dies prior to filing. Indeed, the court understands that the Plaintiff is asserting no such claim. In *Malcolm,* the Alabama Supreme Court reversed a jury verdict for medical malpractice for personal injuries, where the Plaintiff had not filed the action before his death, and the action did not relate back to a complaint that was filed before death (against another defendant). The court affirmed the jury verdict for wrongful death based on medical malpractice. *Malcolm,* 686 So.2d at 240.

Therefore, this court holds that Plaintiff's claim for medical malpractice to the extent that it might claim damages for personal injury, which was not filed at the time of Plaintiff's death, abated upon his death. Defendants' motion for summary judgment as to the malpractice claim is due to be GRANTED to that extent. To the extent that the medical malpractice claim refers to the death of Roberts, it is merged with the wrongful death claim. Defendants' motion for summary judgment on the § 1983 and wrongful death claims because of abatement are due to be DENIED, however. A wrongful death claim does not abate at death; indeed it does not even accrue until death. Also, Defendant has cited this court to no reason why an Alabama statute would abate a § 1983 claim, and the court does not find that it would.

## IV. CONCLUSION

Summary judgment is due to be granted on Plaintiff's medical malpractice claim, to the extent that it may claim damages for personal injury, for the reason that said claim abated when not filed by the date of Plaintiff's death. The motions for summary judgment on all other grounds are due to be, and hereby are, DENIED.

It is hereby ORDERED that Defendants' Motion for Summary Judgment is due to be GRANTED in part and DENIED in part as stated above. The case will proceed on the Plaintiff's § 1983 claim and the medical malpractice/wrongful death claim.