Fitzgerald Columbus HINSON, Plaintiff-Appellee,

v.

Roderick E. EDMOND, M.D., Defendant-Appellant.

No. 98-9178.

United States Court of Appeals,

Eleventh Circuit.

Oct. 20, 1999.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON and BIRCH, Circuit Judges, and OWENS*, Senior District Judge.

EDMONDSON, Circuit Judge:

In this case, the defendant, a privately employed prison physician, appeals the district court's determination that he was ineligible for qualified immunity and its denial of his motion for summary judgment. Because we conclude that the defendant, due to his status as a privately employed prison physician, is ineligible to advance the defense of qualified immunity and that material issues of fact exist on whether the 8th Amendment was violated at all, we AFFIRM the district court's order and REMAND for further proceedings.

## BACKGROUND

Plaintiff is an inmate in the DeKalb County Jail. Defendant is the Medical Director for the jail. Defendant is not a government employee; he is employed by Wexford Health Sources, a for-profit company with which DeKalb County has contracted for medical services for the jail. In June 1995, plaintiff injured his Achilles tendon playing basketball at the jail. On 11 January 1996, surgery was performed on plaintiff's Achilles tendon. In late August 1996, John Schmidt, the DeKalb County Jail Health Services Coordinator, noticed that plaintiff was still in a wheelchair and wearing a hospital gown seven months after surgery and

*Honorable Wilbur D. Owens, Jr., Senior U.S. District Judge for the Middle District of Georgia, sitting by designation.

asked defendant to investigate. Defendant saw plaintiff on 26 August, noticed atrophy in his leg, and asked the nurse to check on plaintiff's appointment at Grady Hospital ("Grady").

On 18 September 1996, plaintiff was examined by a physician's assistant who defendant says arranged for a follow-up appointment to be scheduled for plaintiff at Grady. On 7 October 1996, Defendant says he wrote a consult request form to Grady because plaintiff had yet to be scheduled for an appointment. But, the first written record of a consult request is dated 7 November. Grady set an appointment for 8 November. Plaintiff did go to Grady that day and began a program of rehabilitation.

Later, plaintiff filed a complaint against DeKalb County, Sheriffs Morris and Dorsey,[1] and John Does 1-10 asserting claims under 42 U.S.C. § 1983. The complaint was then amended to include Dr. Edmond. The district court granted summary judgment for all defendants except Dr. Edmond. About Edmond, the court determined that (1) Edmond was not entitled to qualified immunity because the preexisting law was clear that an unreasonable delay in medical treatment was an 8th Amendment violation, and (2) a material issue of fact existed on whether Edmond violated plaintiff's 8th Amendment rights. Edmond appealed.

While this appeal was pending, the parties were directed to file supplemental briefs on the applicability of *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), to the issue of whether Dr. Edmond was entitled to raise a qualified immunity defense at all.[2]

---

[1]Morris was Sheriff of DeKalb County from the end of March 1996 until 31 December 1996. On 01 January 1997, Dorsey became Sheriff of DeKalb County.

[2]Although *Richardson* 's application was not argued in the district court, we are confident that we have before us a record that will allow us to decide the immunity question fairly. In his supplemental brief, Edmond requested that the case be remanded so that the contract between DeKalb County and Wexford Health Sources could be added to the record. We treated this request as a motion to supplement the record and directed that the parties submit an agreed to copy of the contract that was in force between DeKalb County and Wexford Health Sources during the relevant time. The parties were also permitted to submit additional briefs pointing us to portions of the contract that the parties deemed pertinent to the *Richardson* issue.

Although the contract was not reviewed by the district court below, we have the inherent power to supplement the record with materials not submitted to the district court. *See Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1168 (11th Cir.1995); *Jones v. White,* 992 F.2d 1548, 1566-68 (11th Cir.1993); *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1555 (11th

*DISCUSSION*

In *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), the Supreme Court looked at the history and purposes of qualified immunity and determined that they did not support the extension of qualified immunity to prison guards who were employed by a private, for-profit corporation that had contracted with the state to manage the prison.

First, the Court determined that, although historically prisons had been run by both private and state actors, no "firmly rooted" tradition of immunity for privately employed prison guards had developed. *See id.* at 404-06, 117 S.Ct. at 2104. Second, the Court discussed three purposes of qualified immunity: (1) protecting against unwarranted timidity on the part of government officials, (2) ensuring that talented candidates are not deterred from entering public service, and (3) preventing the distraction of governmental officials by lawsuits. The Court then concluded that, because of the influence of market forces on private employers, these same considerations did not support the extension of qualified immunity to the privately employed prison guards. *See id.* at 408-12, 117 S.Ct. at 2106-07.

For the same reasons that the *Richardson* Court declined to extend the doctrine of qualified immunity to privately employed prison guards, we decline to extend qualified immunity to this privately employed prison physician.

Under common law, no "firmly rooted" tradition of immunity applicable to privately employed prison physicians exists under circumstances such as these. That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996)

Cir.1989); *Ross v. Kemp,* 785 F.2d 1467, 1474-76 (11th Cir.1986); *Dickerson v. Alabama,* 667 F.2d 1364, 1367 (11th Cir.1982).

3

(stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

The parties have not been able to point to, and independent research—including a look at the sources cited by the Supreme Court in *Richardson*—does not reveal, cases which show a common law tradition of immunity from liability for privately employed prison physicians for acts amounting to recklessness or intentional wrongdoing. Instead, case law shows that even state physicians may be subject to liability for intentional torts. *See Irwin v. Arrendale,* 117 Ga.App. 1, 159 S.E.2d 719, 725 (Ga.Ct.App.1967) (stating that prison medical director could be sued for intentional tort of battery if prisoner was x-rayed without consent or proper medical justification); *see also Jackson v. Miller,* 176 Ga.App. 220, 335 S.E.2d 438, 439 (Ga.Ct.App.1985) (stating that doctor employed by public clinic was not allowed to advance defense of immunity in a malpractice action because doctor was not acting as government agent when treating patient but was only acting as physician).

And, although the Supreme Court, in passing, mentioned that "apparently, [in England], the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign," *see Richardson,* 521 U.S. at 407, 117 S.Ct. at 2105, the circumstances here do not seem to be the kind of situation encompassed by that statement. The sources cited by the Court suggest that, under certain circumstances, English doctors and lawyers were immune from liability for acts amounting to negligence. For acts amounting to recklessness or intentional wrongdoing, as are alleged here, immunity did not exist, however. *See Tower v. Glover,* 467 U.S. 914, 920-22, 104 S.Ct. 2820, 2825, 81

4

L.Ed.2d 758 (1984) (stating that "English barristers enjoyed in the 19th Century ... a broad immunity from liability for negligent misconduct....Nevertheless, it appears that even barristers have never enjoyed immunity from liability for intentional misconduct"); Joel P. Bishop, *Commentaries on Non-Contract Law* § 704 (Chicago, T.H. Flood & Co. 1889) (same); Bishop, *supra,* § 708 (1889) (stating that physicians could be liable for criminal malpractice but were likely immune from liability for civil negligence).

In addition to the lack of historical support for immunity, the public policy reasons for qualified immunity do not justify the extension of qualified immunity in this case. The *Richardson* Court suggested that the market forces to which a private company is subjected negate the fears of "unwarranted timidity" in the performance of duties. The record in this case reflects just that.

Before December 1995, the medical contractor for the DeKalb County Jail was a different entity, Correctional Medical Services ("CMS"). The record reflects that, before the change from CMS to Wexford, county prison personnel complained about CMS's medical records systems and medical staffing levels. In December 1995, Wexford Health Sources replaced CMS. Furthermore, the record reflects that, after Wexford took over, DeKalb County officials had many meetings with Wexford officials and noted the county's concern that, due to the increased inmate population, the staffing level of the medical clinic might be inadequate. Wexford hired additional medical personnel.

Also, as was the case in *Richardson,* Wexford Health Sources was systematically organized to perform a major administrative task for profit. Wexford was contractually obligated to provide for the delivery of all inmate health care services.[3] With the exception of the county-employed medical personnel who handle the tuberculosis program and some other privately employed mental health personnel, Wexford

---

[3]"Inmate health care" is defined, in the pertinent contract, as "all professional medical, dental, and related health care (excluding in-patient psychiatric hospitalization) and administrative services for the inmates, a comprehensive health evaluation of each inmate following booking into the Jail ...,regularly scheduled sick call, nursing care, regular physician and dentist visits to the Jail, medical specialty services, emergency medical care, medical records management, pharmacy system including pharmaceuticals, over the counter medications, pharmacist services and system management, special medical services including, but not limited to, radiology, diagnostic, and laboratory services, to the extent reasonably necessary in the opinion of a medical professional, and other services all as more specifically described herein."

was responsible for recruiting, interviewing, hiring, training and supervising the health care staff that handles the general medical needs of an inmate population of approximately 3000. Dr. Edmond was the medical director of the jail and was in charge of overseeing the general policies for medical care and of implementing systems to provide greater quality of care at the jail. Wexford also maintained the medical records department for the jail and designed and implemented policies for inmate health care.

Moreover, as was the case in *Richardson,* Wexford performed its task with limited direct supervision and control by the government. Wexford had sole responsibility in all matters of medical judgment. Although Wexford was required to assist, support, and cooperate with the Sheriff when treating an inmate who posed a security risk or was dangerous to himself or others, Wexford was chiefly responsible for identifying and treating such patients.

DeKalb County employed a Physician's Assistant, John Schmidt, to act as a liaison between Wexford and the Sheriff. Schmidt's job was to help ensure that Wexford was complying with its contract: Schmidt did not supervise Dr. Edmond's medical performance, hire or fire Wexford employees, or have the authority to change policies on medical treatment for prisoners. Both Sheriffs Morris and Dorsey said (without contradiction) that Wexford was responsible for the delivery of medical services to prisoners at the jail and that the Sheriff did not undertake to supervise or to train anyone working for Wexford on the provision of medical care at the jail.

Policies and procedures for medical care were established and implemented solely by Wexford and Dr. Edmond. But, in areas which impacted on the security and administration of the jail, the policies were subject to approval by the Sheriff. And, although the Sheriff's Department and jail officials investigated complaints about medical treatment and discussed with Schmidt the status of the jail's medical operations, Sheriff Dorsey did not think that he had the authority to discipline Dr. Edmond. And, Sheriff Dorsey believed that he would have to address problems by contacting Wexford executives or having Wexford replaced. In

6

addition, although monthly Medical Auditing Committee meetings and weekly Senior Staff meetings were held—both of which were attended by Wexford and DeKalb officials, Wexford officials chaired the meetings.

The second policy reason for qualified immunity—ensuring that qualified candidates are not deterred from governmental service by the threat of damages suit—does not change the conclusion suggested by the above analysis. Despite arguments raised by defendant in this case, that the inability of a privately employed prison physician to raise the defense of qualified immunity will deter qualified candidates is doubtful. Employee indemnification, increased benefits and higher pay are all tools at the disposal of a private company like Wexford; and they can be used to attract suitable employees.

The third reason for qualified immunity—that lawsuits may distract employees from their duties—was found insufficient, without more, to cause the *Richardson* court to extend qualified immunity to privately employed prison guards. In addition, the *Richardson* Court observed that, under Tennessee law, privately employed prison guards were not immune from state law claims. Because of this state law, the Supreme Court said that Tennessee "can be understood to have anticipated a certain amount of distraction." *Richardson,* 521 U.S. at 412, 117 S.Ct. at 2107. In a similar way, not only has there been no tradition of immunity for privately employed prison physicians under Georgia common law, it appears that Georgia still provides no official immunity for privately employed prison physicians. *See Cantrell v. Thurman,* 231 Ga.App. 510, 499 S.E.2d 416, 421 (Ga.Ct.App.1998). Thus, Georgia can also be understood to have anticipated a certain amount of distraction due to lawsuits.

We conclude that this case is similar enough to *Richardson* for *Richardson* to guide us, and no strong reason appears in this case to distinguish between privately employed prison guards and privately employed prison physicians.[4] Therefore, Edmond is not entitled to advance the defense of qualified immunity.[5]

---

[4]This determination is consistent not only with the conclusion reached by two district courts in this circuit, *see Nelson v. Prison Health Servs., Inc.,* 991 F.Supp. 1452, 1462-63 (M.D.Fla.1997); *McDuffie v. Hopper,* 982 F.Supp. 817, 825 (M.D.Ala.1997), but is also consistent with *Halvorsen v. Baird,* 146 F.3d 680, 685-86 (9th Cir.1998), where the Ninth Circuit concluded that neither a privately employed detoxification center nor its employees were entitled to raise the defense of qualified immunity. *See also Bibeau v. Pacific Northwest Research Found., Inc.,* 188 F.3d 1105 (9th Cir.1999); *but see Camilo-Robles v. Hoyos,* 151 F.3d 1 (1st

The only issue remaining is whether the district court erred when it denied Dr. Edmond's motion for summary judgment on the merits. We review a district court's summary judgment order *de novo* and apply the same standard as the district court. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112 (11th Cir.1993). In determining whether summary judgment is proper, we review the record in the light most favorable to plaintiff and grant Edmond's motion only if the record demonstrates that no genuine issues of material fact are present and that Edmond is entitled to judgment as a matter of law. *See Steele v. Shah,* 87 F.3d 1266 (11th Cir.1996).

That a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the 8th Amendment is well settled. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hale v. Tallapoosa County,* 50 F.3d 1579 (11th Cir.1995). To survive defendant's motion for summary judgment, Hinson is required to produce evidence sufficient to create a genuine issue of material fact about whether Edmond (1) had subjective knowledge of Hinson's serious medical condition, and (2) was deliberately indifferent to that condition. *See Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997). A delay in treatment can, depending on the circumstances and the length of the delay, constitute deliberate indifference. *See id.; Harris v. Coweta County,* 21 F.3d 388, 394 (11th Cir.1994). So, Hinson must show sufficient evidence to create a material issue of fact about whether Edmond knew of Hinson's serious medical condition and, intentionally or with reckless disregard, delayed treatment. *See*

---

Cir.1998) (stating, without addressing *Richardson* issue, that privately employed police psychiatrists are eligible to raise defense of qualified immunity).

[5]We express no view on the availability of a "good faith" defense to a private defendant under these circumstances. *See Richardson,* 521 U.S. at 412-14, 117 S.Ct. at 2108.

> To the extent that prior precedent may have treated the private employment of a prison health care provider as immaterial to the defense of qualified immunity, *see Adams v. Poag,* 61 F.3d 1537 (11th Cir.1995); *Howell v. Evans,* 922 F.2d 712 (11th Cir.1991), those cases are not controlling in the light of *Richardson.* That a privately employed prison physician acts under color of state law for the purposes of liability under 42 U.S.C. § 1983 remains well settled. *See West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir.1985).

*generally Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986)(to establish that health care provider's acts constitute deliberate indifference to serious medical need, treatment must be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness).

Hinson has pointed to enough evidence to avoid a judgment against him at this time. That Dr. Edmond examined Hinson on 26 August 1999 and noted that there was a serious medical condition—Hinson's leg was injured and the injury was causing atrophy—is undisputed. That Hinson was not treated at Grady until 8 November is also undisputed. Defendant says that, in the interim, the following occurred: (1) on 26 August he instructed the nurse to check on the appointment at Grady, (2) in September, a physician's assistant examined Hinson and wrote a consult request to Grady, and (3) in October, defendant personally wrote a consult request to Grady. Together, defendant contends that this evidence shows that, upon becoming aware of Hinson's serious medical condition, he acted reasonably.

Plaintiff disagrees about what the evidence shows altogether and stresses that, by defendant's admission, a written consult request is required to schedule an appointment at Grady. As the first record of a consult request is on 7 November, and not in September or October as defendant contends, plaintiff argues that a jury could find from the circumstances that defendant's response to Hinson's condition was highly unreasonable and that the seventy-four-day delay in treatment goes beyond negligence to violate the 8th Amendment. *See generally Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742-43 (11th Cir.1996)(discussing non-movant's circumstantial evidence as basis for issue of fact). Given the dispute surrounding what happened during this more than ten-week period, material issues of fact remain concerning what defendant's response, upon learning of plaintiff's serious medical condition, was and whether that response was highly unreasonable. The denial of summary judgment was no error.

For the reasons discussed in this opinion, we AFFIRM the district court's denial of defendant's motion for summary judgment and REMAND for proceedings consistent with this opinion.

AFFIRMED and REMANDED.

9